DuPuy Trust.

40

Argued December 1, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Robert T. McCracken,* with him *Thomas V. Douglass, Thomas E. Whitten* and *Charles T. Bonos, Jr.,* for appellants.

*George Wharton Pepper,* with him *Ernest Scott* and *Kinley J. Tener,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, April 13, 1945:

This litigation has pursued a long, costly and tortuous path, but the record, stripped of non-essentials, now presents for consideration only a question of interpretation of the word "maintenance" in an order of the Orphans' Court of Allegheny County of March 19, 1942.

Herbert DuPuy, in the year 1917, created several large trusts for his three then living children, H. Wilfred DuPuy, Charles M. DuPuy and Eleanor DuPuy Merrick, and their issue, and another trust for the benefit of his granddaughter, Amy DuPuy McHenry. Amy, who

had been born in 1916, was the sole child of a deceased daughter and her husband, Dr. Junius H. McHenry, and ever since her birth has been mentally defective. The trust for her benefit was increased by contributions made to it by Mrs. Herbert DuPuy and ultimately amounted to about $5,000,000. According to its terms DuPuy was himself the trustee and, as such, he reserved to himself and his successors, at his and their discretion, "the right to apply all or any proportion of the income . . . to the education and maintenance of my said granddaughter during the life of this trust." At Amy's death the corpus was to be transferred to her surviving issue, or, if she died without such issue, to the three children above named and, upon the death of any of them, to his or her heirs and assigns. The grantor also reserved to himself the right to designate his successor or successors in the trust.

During the 12 years which intervened between the time of the creation of the trust and DuPuy's death he conducted the trusteeship in somewhat haphazard fashion. He filed no accounts of any kind. For the first three years, while Dr. McHenry was in the army and Amy lived with her maternal grandparents, DuPuy paid to Dr. McHenry, out of the trust income, $10,000 a year, and to himself one third of his own and his wife's household expenses in both their summer and winter homes. From 1920 on Amy lived with her father, and DuPuy paid, out of the trust income, approximately $20,000 a year to Dr. McHenry without at any time requiring an accounting. In 1924 Dr. McHenry remarried and thereafter he and his wife resided in an expensive apartment on Central Park in New York and also in a house in Norwalk, Connecticut, which Dr. McHenry designated as his legal domicile. In 1926 DuPuy contributed $5,000 from the trust income for an addition to this house in order to provide more ample quarters there for Amy. Beginning that same year Amy was sent away to special schools both in summer and winter, and spent with her

father and step-mother in New York only three or four weeks a year and in Norwalk only five or six weeks a year, a schedule which has continued in force down to the present time. Until his death in 1930 DuPuy kept up the payments to Dr. McHenry of approximately $20,000 a year without seeking or receiving any accounting. He presumably realized the fact that the larger part of this money was being used for the upkeep of Dr. McHenry's two homes, with attending servants and automobile, and that Amy herself was deriving, in point of time, relatively small benefit therefrom, but to this situation he apparently gave at least tacit approval.

DuPuy in his will designated Miss Emily W. Reed, his former secretary, as his successor in the trust. She continued to pay to Dr. McHenry $20,000 a year from the trust income until 1935, when Dr. McHenry, who meanwhile had been appointed guardian of Amy by the Probate Court of the District of Norwalk in Connecticut, filed a petition in the Orphans' Court of Allegheny County to have the allowance from the trust increased to $30,000 a year. All the remaindermen who were sui juris expressed their approval of this request, as did also an ad litem guardian for minors and a trustee ad litem for unborn issue who had been appointed by the court. The petition was granted and Miss Reed, as trustee, was directed to pay $30,000 a year thereafter for Amy's education and maintenance. Amy attained her majority in 1937, whereupon Dr. McHenry was appointed by the Norwalk Probate Court as conservator of her person and estate. By that time, as shown by Miss Reed's second account as trustee filed in the Orphans' Court of Allegheny County, income had accumulated to the extent of over $500,000. Dr. McHenry took the position that these accumulations belonged to Amy on the theory that she was entitled to all the income from the trust. This claim was rejected by the court, but, before any appeal was taken from its decision, the matter was compromised by an elaborate agreement entered into in 1938

by all the parties in interest, minors and unborn issue being represented by a duly appointed guardian and trustee. This agreement recited that questions had been raised as to the amount required to furnish suitable education and maintenance for Amy, as well as other questions involving the interpretation of the trust, and it provided that the exceptions filed to Miss Reed's account by Dr. McHenry as conservator should be dismissed, that the income accumulations should be added to the corpus, that out of the annual net income there should be paid to Dr. McHenry as conservator, for the education and maintenance of Amy, the sum of $40,000 a year for the period of ten years commencing January 1, 1939, and thereafter, during the remainder of Amy's life, a minimum sum of $25,000 a year, and that the balance of the net income accruing each year should be added to the corpus of the trust. This agreement was approved both by the Probate Court of Norwalk and the Orphans' Court of Allegheny County. It is obvious that the intention of all the parties who signed this agreement was that, in order to avoid further unseemly discussions as to what were necessary and proper expenditures for Amy's maintenance as distinguished from those subject to challenge as being more directly for the benefit of Dr. McHenry and his wife, a fixed allowance of $40,000 a year should replace his detailed accounting of the outlays claimed by him to have been made for Amy's benefit.

Unfortunately a complicating circumstance ensued. Dr. McHenry having filed in Norwalk his account as conservator for the period from July, 1938 to July, 1939, the court there surcharged him for all sums expended by him in maintaining the New York apartment and the house in Connecticut, and when he filed his next account for the period from July, 1939 to July, 1940, a similar surcharge was imposed. This result was clearly not intended by the parties to the 1938 agreement, since it restored the very difficulties and undesirable features

which it was the object of that agreement to prevent. In order to cure the situation and to remove Dr. McHenry from the danger of recurring surcharges by the Connecticut court, a new agreement was entered into in 1940, this time signed by all the remaindermen as before except the guardian of one of the minors and the trustee ad litem for unborn issue. This second family agreement, after reciting the former one and the facts concerning the action of the Norwalk court, stated that the question in that court had been the propriety of the indirect expenditures for Amy's benefit relating to the maintenance of the summer and winter homes for her with Dr. McHenry and the expenses incidental thereto, that, if its decrees were sustained, Amy would be deprived of those homes, that it was the opinion and desire of all the parties to the agreement that such homes and the incidents thereof should be continued to be maintained for Amy's benefit, and that it was not the intention to modify in any way the substantial rights of any of the parties under the compromise agreement of 1938 but only to alter the method of payment of the income for Amy's benefit; therefore it was agreed that Miss Reed, as trustee, was to pay, out of the income of the trust, the sum of $10,000 a year to Dr. McHenry as conservator and the remaining $30,000 a year to Dr. McHenry as an individual. This agreement was to be subject to the approval of the Orphans' Court of Allegheny County, and accordingly a petition was filed there by Dr. McHenry. All the parties in interest were served with notice, guardians ad litem for minors and a trustee ad litem for unborn issue were appointed, and on January 26, 1942, the court filed findings of fact and conclusions of law, among them being one to the effect that the expenses of maintaining all year round summer and winter homes for Amy in Connecticut and New York were expenses for her education and maintenance within the meaning of the original trust of 1917 and the compromise agreement of 1938. The decree which the court entered ap-

proved the agreement of 1940 and directed that the payments should be made as provided for therein,—$10,000 a year to Dr. McHenry as conservator, for Amy's education and maintenance, and to him as "special trustee" the sum of $30,000 a year for her education and maintenance until January 1, 1949, and thereafter a minimum of $15,000 a year. The decree provided that Dr. McHenry should file with the Court an annual accounting of all payments made to him as special trustee.

The question next arose as to the payment of counsel fees in connection with these proceedings in the Orphans' Court. Due notice having been given to all parties in interest, a hearing was had, and all counsel united in requesting the court to allow for that purpose the sum of $88,500, of which one half should be paid out of the corpus of the trust and the other half temporarily out of corpus but to be recouped from the $40,000 income paid each year to Dr. McHenry to the extent to which there might be an annual surplus therefrom after payment of the expenses for Amy's education and maintenance. Accordingly the court entered an order under date of March 19, 1942, allowing fees in the amount thus agreed upon, and providing that one half thereof should be charged absolutely to corpus and the other half temporarily to corpus but to be reimbursed out of the income paid to the special trustee whenever, upon confirmation of any of his accounts, it should appear that all moneys necessary for the education and maintenance of Amy during the period covered by the account had been expended and that a balance remained in his hands. This order of the court of March 19, 1942, was not excepted to, no appeal therefrom was taken, and it is therefore binding upon all the parties who have an interest in the trust.

In 1943 Dr. McHenry filed in the Orphans' Court of Allegheny County his first annual account as special trustee. As subsequently amended, this account showed that, of the $30,000 income for the year 1942, a balance

of only $1.66 remained. Credit was claimed in the account for an item of some $12,000 to make up a balance of the surcharges imposed by the Connecticut court (which item is not disputed), and the remainder of the $30,000 was alleged to have been disbursed for Amy's education and maintenance, including therein the expenses of the rental of the New York apartment, the upkeep of the Norwalk house, the purchase of household furnishings, the operation of the automobile, and all the items similar to those for which the income received from the trust had regularly theretofore been expended by Dr. McHenry. Some of the remaindermen, disappointed by the failure of the account to reveal any balance that could be applied toward the reimbursement of the corpus for the part of the counsel fees temporarily paid thereout, filed exceptions to the account on the ground that these indirect expenses for Amy's benefit were not proper items to be allowed for her education and maintenance, thus renewing the controversy which had been the motif of all the previous litigation. Testimony was heard and the court entered a decree dismissing the exceptions and confirming the account, whereupon the present appeals were taken.

The justification of the statement made in the opening paragraph of this opinion that the question for determination is the proper interpretation to be ascribed to the term "maintenance" in the order of the Orphans' Court of Allegheny County of March 19, 1942, should now be apparent. Certainly the question is not how broad a scope we would give to that term had we been called upon to construe it originally and before the making of the family agreements. The order of March 19, 1942, unappealed from, is binding upon all parties. When it decreed that part of the counsel fees were to be returned to the corpus out of any balance remaining in the hands of the special trustee after he should have expended "all moneys necessary for the education and *maintenance* of Amy DuPuy McHenry during the period

covered by such accounting", what was intended by the term "maintenance"? Undoubtedly the court understood it as including the terms which are now contested, for it had consistently ruled to that effect and in its adjudication of January 26, 1942 had found as a conclusion of law that the expenses of maintaining the Connecticut and New York homes were expenses for Amy's maintenance within the meaning of both the original deed of trust and the compromise family agreement of 1938 and had stated that the $30,000 a year to be awarded to Dr. McHenry was for expenses in connection with and incidental to the upkeep of those two homes. The remaindermen themselves, including the present appellants, must have had a similar understanding, for in their agreement of 1938 they had consented to the allowance to Dr. McHenry of a flat sum of $40,000 a year which they knew was intended to cover the outlays for those establishments, and they had declared expressly therein that they wished by that agreement to settle the question concerning the amount required to furnish suitable education and maintenance for Amy; likewise in the second agreement of 1940 the signers had stated that it was their desire that the two homes and the incidents thereof should continue to be maintained for Amy's benefit. From every point of view, therefore, it must be concluded that the annual balance of the income received by the special trustee which, by the order of March 19, 1942, was to be turned back to corpus after all expenditures had been made for Amy's "maintenance", was meant to refer only to the balance remaining after the making of expenditures which included therein the outlays for keeping up the New York and Norwalk establishments.

There is another consideration which points in the same direction. The court having found, in its adjudication of January 26, 1942, that the expenses for maintaining those homes were for Amy's maintenance *within the meaning of the 1938 agreement,* the parties thereto, who

48

are all the parties in interest, certainly cannot be heard to repudiate the binding effect of that agreement as thus judicially construed. It may be added that, even if the question were now to be decided de novo, there would be support for the proposition that, from the manner in which DuPuy himself expended the income from the trust, his intention was that the upkeep of the homes, even though occupied by Amy for but short periods of time each year, was properly to be considered as "maintenance" for her within the meaning of that term in the trust which he created.

Objection was made to the manner in which the account of the special trustee was stated, but the Orphans' Court was satisfied, as are we, that nothing could apparently be gained by any greater particularization of the listed expenditures.

Decree affirmed; costs to be paid by appellants.*

---

*We do not wish to be understood as approving the suggestion made by the learned President Judge of the court below that the income from the trust should be paid to Dr. McHenry directly instead of to him as conservator or special trustee.