276

ESTATE OF AMY H. DuPUY, DECEASED, PEOPLES FIRST NATIONAL BANK & TRUST COMPANY AND ELEANOR D. MERRICK, EXECUTORS, PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELEANOR D. MERRICK, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES M. DuPUY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4883, 6874, 6875, 10184.   Promulgated August 29, 1947.

*Paul G. Rodewald, Esq., Thomas V. Douglass, Esq.,* and *Donald L. McCaskey, Esq.,* for the petitioners.

*Homer F. Benson, Esq.,* for the respondent.

OPINION.

MURDOCK, *Judge*: A finding must be made of the value of minority interests in closely held stock of Morewood Realty Corporation, unaided by evidence of actual sales. The Commissioner has abandoned his determinations of higher values and now contends for a value of $2,056 per share on the valuation dates. That amount will result from dividing the stipulated fair market values of the underlying assets, less liabilities, by the number of shares outstanding. It is supported by the opinion of a witness called by the Commissioner. There is little, if any, other evidence to support it. The respondent and his witness unjustifiably minimize the importance of earnings and dividends to the point of elimination as factors in determining the value of this stock and place too much reliance upon the agreed values of the underlying assets.

There is some evidence of the history, management, earnings, dividends, finances, and prospects of Morewood and its subsidiaries, as well as other evidence. The petitioner called two witnesses, who expressed opinions that the value of the stock was not more than $775 or $800 per share. They indicated that they had considered all of the evidence and explained how they had arrived at their opinions and why they thought that asset value was not determinative or as important a factor as earnings in deciding the present question. Their testimony is helpful.

The evidence does not lead irresistably to any amount as the obviously correct value, but, since a finding of a precise amount must be made, the Court has concluded, after considering all of the evidence

in the case, that the value of the stock on the valuation dates was $1,300 per share.

Herbert DuPuy died on January 10, 1930. It is conceded that he left his residuary estate in trust, naming his wife Amy as trustee and also as life beneficiary, although his will might have been more specific in creating a trust. Included in the trust were 2,328 shares of stock of Connellsville. Amy, as trustee, received distributions on that stock from August 1, 1935, to the date of her death on August 31, 1941, in the total amount of $111,744. The Commissioner has determined that the $111,744 should be included as a part of Amy's gross estate because it represented income of the trust to which she was entitled as life beneficiary. The petitioner contends, on the other hand, that the entire amount represents capital distributions which the trustee was required to hold for the remaindermen and which the life beneficiary was not entitled to receive. Both parties agree that this issue must be decided under the law of Pennsylvania, and they cite numerous cases in support of the positions which they take. It should be remembered that the question is not how these payments were to be accounted for for Federal income tax, but rather the question is how the distributions made by Connellsville in the course of liquidating its assets and winding up its affairs are to be accounted for under the laws of Pennsylvania.

The primary rule for interpretation of a testamentary trust is to bring to fruition the intention of the testator in so far as his intention can be determined from the provisions of the will and from any surrounding circumstances which may properly assist the Court in determining what his intention probably was. The respondent says that the distributions in question were made out of depletion reserves and cites Pennsylvania cases for the proposition "that the income beneficiary is legally entitled to the income realized from wasting assets without deduction for depletion or the duty to maintain intact value of stock of corporations dealing in wasting assets." *Knox's Estate*, 328 Pa. 177; 195 Atl. 28; *Crozer's Estate*, 336 Pa. 266; 9 Atl. (2d) 535. The testator in the *Knox* case owned stock of a wasting asset corporation. He had received dividends regularly over a period prior to his death. The Court, endeavoring to find and carry out his intention, held that he intended the life beneficiary "to have the benefit of all dividends paid out of profits from mines opened during his lifetime, whether from depletion reserves set up out of earnings or ordinary earnings above such reserves." It was not disputed that the dividends in that case came from profits made by the corporation in carrying on mining operations. The *Crozer* case is similar to the *Knox* case. The present case is distinguishable. Here the corporation was not paying dividends regularly at the time of the decedent's death. The distributions in question were not profits from mines opened during his lifetime; they were not

from depletion reserves set up out of earnings, or ordinary earnings above such reserves for the period after Herbert's death. The petitioners argue that where stock of a corporation, even stock of a wasting asset corporation, is placed in a trust of which one person is a life beneficiary and others are remaindermen, all extraordinary, liquidating distributions such as those involved in the present case must be retained by the trustee as a part of the corpus for the remaindermen and no part thereof may be distributed to the income beneficiary.[1]

Amy never distributed to herself, as life beneficiary of the trust, any of the amounts which she had received as trustee from Connellsville. There was litigation in the courts of Pennsylvania, between her executors and the remaindermen of the trust, over the Connellsville distributions to the trust. The executors of Amy, acting for her as trustees under the will of Herbert, filed an account of the residue received by her under Herbert's will. Exceptions to this account were filed by or for the remaindermen under the Herbert trust, who claimed that Herbert had given Amy a legal life estate rather than an equitable one, and that she, having received a legal life estate, was indebted to them for the "intact value" of the Connellsville shares at the time of his death, and her executors, who were proposing by the account to turn over to the remaindermen the liquidating certificates, plus cash in the amount of $111,744, or property having a total value less than the value of the Connellsville shares at the time Herbert died, would have to make up the difference out of Amy's separate estate. The Pennsylvania courts held that Amy took an equitable life estate and was not liable to the remaindermen for any more than that allocated to them in the account. *In re DuPuy's Estate*, 346 Pa. 143; 29 Atl. (2d) 689. The court did not pass directly upon whether the distributions amounting to $111,744 belonged to the life tenant or to the remaindermen, but that amount was accounted for as trust corpus to which the remaindermen would be entitled. The parties in that litigation recognized that the $111,744 belonged to the remaindermen and not to the life beneficiary and the action of the court was consistent with that view.

There are a number of Pennsylvania cases which hold that extraordinary distributions made by a wasting asset corporation from contributed capital on stock held by a trust must be retained as part of the corpus and may not be distributed to the life beneficiary. Those

---

[1] The respondent does not argue that Herbert was aware at the time of his death that there would not be any further earnings and that any distributions on the stock would have to come from the sale of its remaining assets in winding up its affairs and, consequently, he might have intended the life beneficiary to have some or all of those distributions. Cf. *DeBrabant* v. *Commercial Trust Co.*, 113 N. J. Eq. 215; 166 Atl. 533; 43 Yale Law Journal, note at page 1336. It is perhaps significant that Herbert's residuary estate contained a substantial amount of income-producing property and Amy also had a large separate estate and income of her own, so that she was not dependent entirely upon the shares here in question.

cases recognize that dividends paid by wasting asset corporations out of earnings before depletion may be distributable to the life beneficiary, but, where they represent a distribution of the proceeds of the sale in liquidation of capital assets or reserves accumulated during the lifetime of the testator, they are not distributable to the life beneficiary as, for example, in the case of liquidating distributions. See *Nirdlinger's Estate*, 327 Pa. 160; 193 Atl. 33; *Mallory's Estate*, 285 Pa. 186; 131 Atl. 714; *Wittmer's Estate*, 283 Pa. 311; 129 Atl. 85; *Waterman's Estate*, 279 Pa. 491; 124 Atl. 166; *McKeown's Estate*, 263 Pa. 78; 106 Atl. 189; *Woolston's Estate*, 36 D. & C. 574. "This equitable rule is based on the presumption that a testator or settlor intends exactly what he in effect says, namely, to give to the remaindermen, when the period for distribution arrives, all that which, at the time of his decease, legally or equitably appertains to the thing specified in the devise, bequest, or grant, and to the life tenants only that which is income thereon." *Waterman's Estate, supra.* It is not argued in this case that there was any occasion for apportionment of the distributions in question between the life tenant and the remaindermen. The facts indicate that the distributions were in their entirety a partial return of contributed capital and a partial return of the value of the stock at the time the testator died. The court held in *Sternbergh's Estate*, 337 Pa. 342; 10 Atl. (2d) 376, "Where all of the assets of the corporation are sold, it is only if the proceeds exceed the intact value of the stock that apportionment can be made"; otherwise the entire proceeds from the disposition of the assets go to the remaindermen. The agreement with Hillman was a sale of coal in place under Pennsylvania law. *Hosack* v. *Crill*, 18 Pa. Super. 90.

The evidence shows that all of the distributions here in question were made as a part of the process of selling the remaining assets and winding up the affairs of Connellsville. They were not regular dividends, but were liquidating dividends. Each distribution was made at a time when Connellsville had no earnings from operations even before depletion, but, on the contrary, had a deficit, as contrasted to the surplus which it had at the time of Herbert's death. There were no earnings from operations during the period of the distributions. The total amount of the liquidating distributions was much less than the par value of the shares. The cases cited by the petitioners indicate that, if the courts of Pennsylvania had before them the precise question involved herein, they would hold that Herbert's intention as disclosed by his will and surrounding circumstances was that the distributions here in question were not to go to the life beneficiary. This question, as presented by the parties, is decided for the petitioners.

The Commissioner contends that the gifts made by Amy to her six grandchildren on December 27, 1935, and the gifts in trust to her three minor grandchildren on January 28, 1938, were made in contemplation

of death. He makes no argument that any of them were to take effect in possession or enjoyment at or after death, and there is no basis for such a contention. He points out that Amy had had a heart attack in 1930, had had a tumor removed in 1935, had failing eyesight, had swollen ankles, and was old when she made the gifts here in question. He argues from these and some additional facts of no greater significance that the gifts were made in contemplation of death.

The evidence as a whole fairly preponderates in favor of the petitioners' contention that the gifts were not made in contemplation of death. Amy had completely recovered from the heart attack in a short time. The operation for the removal of a small benign tumor was not serious and was never regarded as serious. Amy was no longer young in years when she made the gifts, but she was still active, healthy, vigorous, and much interested in her family, in business, and in other affairs. She was not worried about her health. Her death, in August 1941, resulted from myocardial insufficiency following a fall two weeks earlier due to poor eyesight. She and her husband had both made many gifts aggregating over $20,000,000 to or for their children and grandchildren. They had thus made their children independently wealthy. The gifts made on December 27, 1935, were similar to previous gifts made to provide homes, education, and living comforts for her grandchildren so that she could see them living in the manner to which they were accustomed and in which she desired them to live. The 1935 gifts were prompted by her desire to provide Charles, who had been married in 1934, with money to build a home. She had previously given Eunice money for a like purpose. She checked on previous gifts to each grandchild and made the other gifts at that time to bring her gifts to each to a desired total. Amy was still a wealthy woman after they were completed. All of those gifts were made for purposes connected with life rather than in contemplation of death.

The birthday gifts, in much smaller amounts, were clearly not made in contemplation of death, but were merely to gratify her desire to give each grandchild something to commemorate the day. The respondent makes no argument in his brief specifically directed to those gifts. He seeks to include in Amy's gross estate only three of eight or nine gifts made on that occasion. He suggests no distinction between the three and the others. They were all in celebration of Amy's long enjoyed and continuing good health rather than in contemplation of death.

The respondent makes several contentions in regard to the accumulations of income from the Amy McHenry trust. All are based upon the proposition that trust income in excess of distributions and expenses accumulated and to be accumulated during the life of the

beneficiary constitutes illegal accumulations under the law of Pennsylvania.[2] He argues that 32.51 per cent of that income reverted and belonged to Amy H. DuPuy at the time of her death, since she was a grantor of the trust to that extent and would be entitled to those accumulations; the remaining accumulations from the date of Herbert's death to the date of Amy DuPuy's death fell into Herbert's residuary estate and were distributable to Amy as life beneficiary and formed a part of her estate at her death; and the value at Amy's death of her right to receive 32.51 per cent of future accumulations during the life of Amy McHenry should be included in her estate also as property belonging to her. The petitioners contend that none of the accumulations were in violation of the Pennsylvania law.

This raises the question of the extent, if any, to which the accumulations of this trust were in violation of the Pennsylvania law. It provides that a direction to accumulate "shall be null and void in so far as it shall exceed the limits of this act" and the income directed to be accumulated contrary to the law shall go to those who would have been entitled to receive it if no such illegal accumulation had been directed. A direction to accumulate during the life of a grantor is not prohibited by the law. Therefore, the accumulations during the life of Amy H. DuPuy would not be made null and void by the act unless it means by implication that the accumulations must go immediately to some designated person at the end of that time and can not be held for later distribution to the remaindermen. The act does not mention any such requirement. The orphans' court which considered the trustee's account did not pass directly upon the question, but seems to have been of the opinion that all accumulations during the life of Amy DuPuy were valid. No contra authorities are cited. If Amy McHenry had died on or prior to August 31, 1941, when Amy DuPuy died, the accumulations would have gone immediately to the remaindermen and there would have been no accumulations in violation of the law. Thus, it seems clear that Amy DuPuy was never entitled to any accumulations up to the date of

---

[2] "No person or persons shall, after the passing of this act, by any deed, will, or otherwise, settle, or dispose of any real or personal property, so and in such manner that the rents, issues, interests, or profits thereof, shall be wholly or partially accumulated for any longer term than the life or lives of any such grantor or grantors, settler or settlers, or testator, and the term of twenty-one years from the death of any such grantor, settler, or testator, that is to say, only after such decease during the minority or respective minorities, with allowance for the period of gestation of any person or persons, who under the uses or trusts of the deed, will, or other assurance directing such accumulation, would, for the time being, if of full age, be entitled unto the rents, issues, interests, and profits so directed to accumulate, and in every case where any accumulation shall be directed otherwise than as aforesaid, such direction shall be null and void in so far as it shall exceed the limits of this act, and the rents, issues, interests and profits, so directed, to be accumulated contrary to the provisions of this act, shall go to and be received by such person or persons as would have been entitled thereto if such accumulation had not been directed; * * *" (Act of April 18, 1853, P. L. 503, § 9, 20 P. S., § 3251.)

her death, either directly as a grantor or indirectly as life beneficiary of a trust made up of Herbert's residuary estate.[3]

Amy McHenry survived Amy DuPuy. If excess income after the death of Amy DuPuy could have been accumulated during the life of Amy McHenry, who was not to receive that income, such accumulations might have been void under the law and 32.51 per cent might have reverted to Amy DuPuy's estate. But the compromise agreement and the order of the orphans' court provided for the disposition of all future income of the trust and provided in such a way that Amy DuPuy would never be entitled to receive any of it. All parties were bound by that agreement and decree, *In re McHenry*, 352 Pa. 39; 42 Atl. (2d) 52, and when Amy died neither she nor her estate had any right or interest in any income from the trust. *Stoffel's Estate*, 295 Pa. 248; 145 Atl. 70, cited by the respondent to show that the agreement was not fully effective, involved different facts which easily distinguish it. The court there rejected an attempted rewriting of a will by an agreement of the interested parties.

The respondent also contends that Amy DuPuy, by entering into the agreement of May 25, 1938, made a transfer in contemplation of death. If she was not entitled to any accumulations up to the date of the agreement or up to the date of her death, of course, she could not transfer any interest in those amounts. If she had any rights, she disposed of them. Her rights, if any, to future accumulations were also terminated by that agreement and the decree which approved and adopted it. But she did not enter into the agreement in contemplation of death or transfer anything thereby in contemplation of death. Her chief concern was for her grandchild, Amy McHenry, and next for the child's father, who was taking care of her. Amy's motive had to do with the present rather than after her death. She wanted the family litigation terminated promptly so that adequate funds for the care of the incompetent would continue to be furnished to McHenry from the trust which she had helped to set up many years previously. She wanted none of the income of the trust and had no thought of transferring any of it, past or future, in contemplation of death.

The respondent also argues that the transfer in trust for Junius H. McHenry dated June 17, 1938, was made in contemplation of death. It was made because she wanted him to have some income in addition to that which came to him from the trust for his daughter and to induce him to settle the family litigation. What has been said in regard to any possible transfer resulting from the compromise being in contemplation of death applies here also. The only additional circumstance worth mentioning is the fact that Amy, after setting up the trust, changed her will to eliminate a provision for the benefit of McHenry.

---

[3] No authorities have been cited to show whether an illegal accumulation reverting to Herbert's estate would be distributable therefrom as income or would be corpus.

The record shows, however, that the trust was not a mere substitute for a testamentary disposition. Her main purpose was to achieve immediate objectives desirable to her during her lifetime, i. e., additional aid to McHenry and settlement of family litigation which was distressing to her.

The above discussion covers all of the contentions urged by the respondent in his brief, but it might be well to state that there are no other provisions of section 811 under which any of the Amy McHenry trust income or the Junius McHenry trust could be included in Amy's gross estate. Amy retained no powers under either trust. The agreement of May 25, 1938, and the trust of June 17, 1938, took effect at once.

*Decisions will be entered under Rule 50.*