Paul E. Reinhold v. Commissioner.
Reinhold v. Commissioner
Docket No. 15668.
United States Tax Court
1948 Tax Ct. Memo LEXIS 78; 7 T.C.M. (CCH) 697; T.C.M. (RIA) 48196; September 30, 1948
*78 Petitioner, on March 15, 1943, gave to his wife 42,721 shares of the common stock of Foremost Dairies, Inc., and on April 10, 1943, 3,991 shares of Foremost Dairies preferred stock. The tax returns for such gifts were not filed with the Collector until July 1944. Held, the fair market value of the common and preferred stock on the respective dates of the gifts determined. Held, further, that petitioner is liable for a delinquency penalty for his failure to file returns within the time prescribed by law. Robert R. Milam, Esq., and Warren F. Wattles, Esq., Greenleaf Bldg., Jacksonville, Fla., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a gift tax liability for the calendar year ended December 31, 1943. Petitioner requests a redetermination of the deficiency of $71,052.79 and a delinquency penalty of $14,456.62. The first issue involved is whether the respondent erred in determining the value of 42,721 shares of the common stock of Foremost Dairies, Inc. (hereinafter referred to as Dairies), which was the subject of a gift by petitioner to his wife on March 15, 1943, and *79 3,991 shares of the preferred stock of the same company also transferred as a gift by petitioner to his wife on April 10, 1943. The petitioner in his gift tax return reported the common shares at a value of 50 cents per share and the preferred shares at a value of $8 per share. The Commissioner determined the value of the shares on the dates of the gifts as $7 per share for the common stock and $20 per share for the preferred. On brief, the petitioner states that the evidence appears to support a value of $10 per share for the preferred stock. The second issue relates to petitioner's liability for the delinquency penalty due to his failure to file his gift tax return for the taxable year 1943 within the time prescribed by law. Findings of Fact The petitioner, Paul E. Reinhold, is an individual residing in Venetia, Jacksonville, Florida, and is the president of Foremost Dairies, Inc., a Delaware corporation. His Federal gift tax return for the calendar year 1943 was executed by petitioner on July 5, 1944, and was filed with the collector of internal revenue for the district of Florida at Jacksonville, Florida, some time thereafter in the month of July, 1944. Petitioner has been *80 in the dairy business all his life. He and his father sold out their interests in a Pittsburgh dairy in 1930 to the Beatrice Creamery Company. In 1931, he was retained to make a survey of Foremost Dairy Products, a Florida corporation, hereinafter sometimes referred to as Products. Petitioner found the financial condition of Products to be deplorable and formed a plan whereby certain assets of that company were to be taken over by a new company under the name of Foremost Dairies, Inc. Petitioner reported this plan to the men who had hired him and shortly thereafter entered into a contract with them providing that he should become the president of the new corporation at a salary of $12,000 a year, and that in addition he should receive up to 22 1/2 per cent of that corporation's common stock over a three-year period. Some time thereafter Products encountered further financial difficulties. In an effort to keep that company going, J. C. Penney and one Gwinn loaned it $800,000, taking in exchange notes in this amount secured by mortgages on the physical properties of Products. Foremost Dairies, Inc., a Delaware corporation, was organized in October, 1931, to acquire the properties *81 of Products. At the time of its organization it issued 10,000 shares of 6 per cent cumulative preferred stock with a par value of $100 and 50,000 shares of common stock with a par value of $1. This preferred stock carried cumulative dividends to the extent such dividends were earned during the year. All of its issued stock was transferred to Products in exchange for various assets of that company. This left Products a holding company. The stock of Dairies was pledged by Products to secure the $800,000 in notes which Products owed Penney and Gwinn. Upon the substitution of this stock as security for that indebtedness, Penney and Gwinn released their mortgage on the physical assets of Products and these assets were transferred to Dairies. Products later defaulted and the Penney-Gwinn interests foreclosed, taking over the pledged stock in 1934. The Penny-Gwinn interests bought the pledged stock of Dairies at a public sale which followed the foreclosure, paying $195,000 for all the issued preferred stock and $5,000 for 77 1/2 per cent of the common stock. The 22 1/2 per cent, or 11,250 shares, which at that time were not subject to the pledge, were the shares being acquired by the petitioner *82 under his contract of employment. Some time thereafter Products was dissolved for failure to pay state taxes. Dairy plants acquired by Dairies from Products were located at Birmingham, Alabama, Columbus, Georgia, Atlanta, Georgia, Charlotte, North Carolina, Savannah, Georgia, Jacksonville, Florida, and Daytona Beach, Florida. In only two of these locations did Dairies retain the real property. In the remainder of the locations the existing equipment was kept by Dairies, but the real property was conveyed back to the noteholder and then rented by Dairies to continue the dairy business. In 1935 Penney and Gwinn, as a voluntary gesture, decided to give the stockholders of Products, whose interests had been wiped out by the stock foreclosure, an opportunity to participate in Dairies. For each five shares that such shareholders had held in Products they were allowed to buy one share of Dairies preferred stock and two shares of its common stock at a unit price of $7. For the purpose of making this offer, Dairies was recapitalized by a 5 for 1 stock split-up in which the par value of each share of its issued stock was reduced, the par value of the preferred stock from $100 to $20 a share *83 and the par value of its common stock from $1 to 20 cents a share. A relatively small number of these stockholders participated in the purchase of the stock on that basis. Dairies (Del,) had several subsidiaries during its early years, namely, Foremost Dairies of Pennsylvania, Foremost Dairies of South Carolina, and Foremost Dairies, Inc., of New York. These companies were merged with Dairies before the dates of the gifts here involved. Dairies originally paid $1,000 for all of the stock of Foremost Dairies, Inc., of New York and subsequently sold it to Emmadine Farms (a J. C. Penney organization) for the same sum. After Emmadine Farms operated Foremost Dairies, Inc. (N. Y.) for a year or two at a substantial loss, it cancelled a debt of about $600,000 owing from that company and sold the stock thereof back to Dairies for $100,000. Foremost Dairies, Inc., (N. Y.) sustained heavy operating losses even after its merger with Dairies. When Dairies acquired the assets of Products in 1931 it entered good will on its books at a value of $1,500,000 and this amount was claimed as a part of the invested capital of Dairies. Subsequently the book value of good will was adjusted downward on *84 the books of Dairies from $1,500,000 so that as of December 31, 1942, good will was carried at only $616,765.47. In 1944, the Securities & Exchange Commission required Dairies to write good will (and organization expense of $3,314.12) down to $1 as a condition to accepting the registration of certain of its stocks being offered by the large shareholders for sale. With the outbreak of World War II, Dairies was requested by the armed forces to serve milk and ice cream to the naval base near Jacksonville, Florida, and to Camp Blanding, a nearby army post. This business could only be done on a 90-day bid basis and as a condition to securing such business Dairies was required by the United States Department of Health to make alterations in its Jacksonville plant which cost the company about $250,000. With the acquisition of this new business the company's earnings began to rise. Roughly one-third of the company's sales was to the Army and Navy, but the indirect sales due to the Army and Navy brought the total for which the war was responsible to more than one-third of the corporation's total business. The effect of the war on other business factors made the immediate future of the dairy *85 industry very uncertain. England had stopped the manufacture of ice cream and the dairy industry was faced with the possibility that this country would also eliminate the manufacture of ice cream except for Army and Navy morale purposes. All dairy securities were severely depressed in the market, starting about the fall of 1942, as a result of uncertainty whether operations could be continued in the ice cream division or satisfactorily in the milk division because of the various war-time restrictions and limitations placed on the industry. Daily deliveries of milk were stopped and the company was limited in the number of miles it could run a milk truck. The sugar situation was very uncertain and the company was being rationed on butterfat. Dairies some time prior to the taxable year had secured loans of about $150,000 from the Reconstruction Finance Corporation and $250,000 from the Equitable Insurance Company. Late in 1942, it approached the brokerage house of Merrill, Lynch, Pierce, Fenner & Beane to get that firm to borrow in Dairies' behalf approximately $600,000. This $600,000 was to be used to pay off the prior loan of the Equitable Insurance Company and to supply additional *86 working capital needed to keep pace with expanding sales. Although five or six insurance companies were asked to make such a loan all refused. At this same time, the company was faced with the prospect of paying large income and excess profits tax deficiencies which could amount to as much as $280,000. At the conclusion of a revenue agent's examination, completed in November, 1943, a deficiency in income and excess profits taxes for 1942 was determined against Dairies totaling $199,000. This deficiency was ultimately settled by the payment of additional taxes of $52,233.34 for 1942, and a deficiency for 1941 was settled for $11,742.18. By 1942, unpaid dividends upon the preferred stock of Dairies had reached an amount in excess of $300,000. On or about July 1, 1942, the leading stockholders, including J. C. Penney and the petitioner, waived and forgave accrued dividends on their preferred shares in the amount of $307,067.87. Some of the smaller stockholders refused to waive the accumulated dividends upon their preferred shares and were paid $1,248.92 in cash and 1,488 shares of Dairies' $20 par value preferred stock in settlement thereof. The sales of Dairies, including subsidiaries, *87 from 1937 to 1944, inclusive, were as follows: 1937
$ 2,516,702.87
1938
2,397,543.73
1939
2,531,154.37
1940
2,828,066.91
1941
4,057,634.41
1942
6,164,383.22
1943
9,000,000.00 (approx.)
1944
11,000,000.00 (approx.)
The net income of Dairies and its subsidiaries after full allowance for all taxes, including deficiencies later determined and before provision for dividends on its preferred stock for the years 1937 to 1943, inclusive, was as follows: Net Income per Share
of Common Stock After
Allowance for Pre-
Year
Net Income
ferred Dividends
1937
$ 66,164.33
.014
1938
77,309.31
.06
1939
105,816.43
.15
1940
116,063.25
.18
1941
131,847.70
.24
1942
361,336.07
1.01
1943
398,233.41
1.13
Following the forgiveness of unpaid accumulated dividends on preferred stock by the principal stockholders in the latter part of 1942, the company began paying regular quarterly dividends of 1 1/2 per cent on its outstanding preferred stock and paid one such dividend on October 1, 1942, another on January 1, 1943, and others quarterly thereafter. It also paid the first dividend on its common stock in its history, a dividend *88 of 5 cents per share declared on February 8, 1943, payable April 15, 1943, to stockholders of record on April 12, 1943. Other dividends of 5 cents per share were paid quarterly thereafter during 1943. The two dairy companies most nearly comparable to Dairies were Philadelphia Dairy Products and Arden Farms. These companies were somewhat larger than the petitioner. During the four years immediately preceding the taxable year, these companies, like Dairies, paid no dividends on their common stock. Philadelphia Dairy Products was selling on or about the time of the gift at a price 2.3 times its average annual earnings over the four-year period 1939 to 1942, inclusive, and the common shares of Arden Farms were selling at 2.7 times its average annual earnings for the same period. Dairies had average annual earnings of 39.5 cents per share during the four years 1939 to 1942, inclusive. The net worth of Dairies on December 31, 1942, was $2,100,703.78. This figure included good will valued at $616,765.47 and organization expense of $3,314.12. Computed on the basis of these figures, the book value of the corporation's common stock per share was approximately $3.55. The book value per share *89 of common stock, after the elimination of good will and organization expense, was approximately $1.46 per share. Dairies had approximately 244 stockholders during the spring of 1943. There were 185 stockholders holding both preferred and common stock, 44 who held only common and 15 who held only preferred. The largest stockholders were J. C. Penney and the petitioner and his family. The total Penney and Reinhold family holdings were as follows: Shares of
Shares of
Common Stock
Preferred Stock
Owned
Owned
Penney family
124,569
32,392
Reinhold family
97,171
3,991 At the time of the gifts by petitioner to his wife, there were outstanding 296,579 shares of common stock and 52,368 shares of preferred. The 42,721 shares of common stock given by petitioner to his wife on March 15, 1943, constituted 14.4 per cent of the total shares of common stock then outstanding. The 3,991 shares of preferred stock conveyed by petitioner to his wife on April 10, 1943, represented 7.6 per cent of the issued and outstanding preferred stock at that time. In December, 1942, the petitioner, Louis Kurz, and Victor Markwalter purchased 22,185 shares of the common stock *90 of Dairies at 50 cents per share and 5,610 shares of the preferred stock at $10 per share from one Hill, a large stockholder in Dairies. This purchase was made pursuant to an option Hill had given the purchasers some time before and which had been renewed by them from time to time. Petitioner proposed to the various branch managers of Dairies that they each purchase 620 shares of common and 310 shares of preferred at the price at which the stock was being acquired from Hill. The managers refused to take the whole allotment, most of them taking a half or less. Petitioner retained 4,144 shares of the common stock and 412 shares of the preferred stock acquired from Hill. These shares formed part of the stock which was the subject of petitioner's gift to his wife. With the exception of the block of stock purchased by petitioner and his associates from Hill in December, 1942, no sales of comparable size were made during the period immediately before or after the dates of the gifts herein. The stock of Dairies was not listed on any stock exchange during or prior to the taxable year. Such shares were transferred only in over-the-counter purchases. From January 14, 1943, to the date of *91 the gift of the preferred shares, April 10, 1943, bid prices were posted from time to time for small lots of the stock but during that entire period none of the preferred shares were offered for sale and no asked prices were posted. From December 19, 1942, to the date of the gift, on three occasions small lots of common shares were offered for sale with no bids posted on the dates of the offer. On one occasion during that period one bid for 100 shares was posted and no offering made. These bid and asked prices do not reflect fair market value. The fair market value of the 42,721 shares of the common stock of Dairies on March 15, 1943, was $1.15 per share. The fair market value of the 3,991 shares of preferred stock of Dairies on April 10, 1943, was $10 per share. The respondent determined the deficiency in the instant case as follows: "Upon the basis of net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock, including certain sales of shares of the corporation's stock, it is determined that on March 15, 1943 the 42,721 shares of capital stock, common, of Foremost Dairies, Inc. which the donor transferred *92 by gift had a value of $299,047.00, which is at the rate of $7.00 per share; and that the 3,991 shares of 6% cumulative preferred stock of the corporation which donor transferred by gift on April 10, 1943, had on that date a value of $79,820.00 which is at the rate of $20.00 per share." Petitioner's gift tax return for the year 1943 was not filed until some time in July, 1944, having been executed by petitioner on July 5, 1944. This return was prepared by Mr. J. R. Lindley, treasurer of Dairies and petitioner's secretary before the due date for filing. The return was supposed to have been transmitted to counsel but found its way into the petitioner's personal file which was kept at the office of Dairies by his secretary. Petitioner knew that the return had been prepared but was under the impression that it had been executed and filed. He was out of the city on March 15, 1944, and most of the spring of 1944 attending to business. Some time after March 15, 1944, he discovered both the original return and the copy in his personal file. The return was filed immediately after it was discovered, without any request from the Collector. Opinion ARUNDELL, Judge: The question presented *93 in this case is the fair market value of two blocks of stock which were given by petitioner to his wife. On March 15, 1943, petitioner made a gift of 42,721 shares of the common stock of Dairies and on April 10, 1943, he gave his wife 3,991 shares of the preferred stock of that company. Foremost Dairies was organized in 1931 as a successor to another dairy company which had suffered such financial reverses that a reorganization was necessary. The new company from the very beginning was beset with difficulty and it was not until the advent of World War II and the increased demand for dairy products that flowed from the establishment of large military installations that it enjoyed in real measure a successful operation. The stock in Dairies was relatively closely held. It was not listed on any Exchange and had, on the whole, a very restricted market. For this reason we have considered in our determination the effect that the offering of a block of shares as large as that given by petitioner to his wife would have had on their fair market value. Estate of Leonard B. McKitterick, 42 B.T.A. 130. At or about the time of the gifts in question, with the possible exception *94 of the socalled Hill transaction set forth in our findings, there were no sales that could be regarded as a true criterion of value. The Hill block of stock consisted of 22,185 shares of common and 5,610 shares of preferred, all of which was sold in December, 1942, at a price of 50 cents per share for the common and $10 per share for the preferred. An option had been given by Hill covering these securities at the prices paid and the transaction occurred with the exercise of that option. Unfortunately, the record does not disclose when the option was given and the price fixed. By the middle of 1942, unpaid dividends on the preferred shares had accumulated in an amount in excess of $300,000. This single factor, had it not been for the forgiveness of these unpaid dividends by the principal stockholders, would have made the payment of dividends on the common stock a practical impossibility for years in the future. Following this forgiveness, and as a result thereof, Dairies began the payment of regular quarterly dividends of 1 1/2 per cent on its preferred stock, the first regular dividend being paid on October 1, 1942. Thereafter, quarterly dividends were paid. Dairies also declared *95 the first dividend on its common stock in its history on February 8, 1943, at the rate of 5 cents per share. Other dividends of 5 cents per share were paid quarterly thereafter during 1943. The earnings of Dairies from 1937 to 1941 had been slowly increasing, viz., from.014 in 1937 to.24 in 1941. In 1942 the earnings on the common reached the figure of $1.01. This increase in earnings in 1942 was due in a large measure to the sale of dairy products and ice cream to the military bases. This business, at best, was considered as only temporary. Coexistent with this increase in business due to the advent of war were a number of other factors which made Dairies' immediate financial future doubtful. The manufacture of ice cream, which was one of the most profitable branches of the dairy business, faced the possibility of being eliminated except for Army and Navy morale purposes. The sugar situation was very uncertain and by the latter part of 1942, Dairies had already been rationed on butterfat. Daily deliveries of milk had been suspended and the company was required to make deliveries every other day. Limitations had been placed on the number of miles over which it could operate its trucks. *96 In order to secure the government business, Dairies had to make large capital outlays, and the expansion of the business called for an increase in its working capital. Late in 1942, it had endeavored to secure large loans from various insurance companies to fill its financial needs but in this effort it was unsuccessful. At about the same time, late in 1942 and early in 1943, Dairies faced unsettled and undetermined tax deficiencies which might reach a figure as high as $280,000. The book value of the common shares on December 31, 1942, was $3.55 per share, but this figure was arrived at by including in net worth an item of good will in the amount of $616,765.47 and organization expenses in the sum of $3,314.12. It is interesting to note that in 1944 the Securities & Exchange Commission, as a condition to accepting the registration of Dairies' stock being offered for sale, required the write-off on the books of the company of these two items. With the net worth thus reduced, the book value per share of the common stock was approximately $1.46. As was stated by this Court in Estate of Amy H. DuPuy, 9 T.C. 276, 284, the evidence "does not lead irresistibly to any amount *97 as the obviously correct value * * *." The Commissioner in making his determination, as set forth in the deficiency notice, lists as the basis of his determination all the factors ordinarily included in determining stock value in the case of closely held securities with little or no market. In reaching our conclusion as to the fair market value, we have considered such factors as the organization and history of Dairies; the book value of the stock; the earnings and dividend-paying capacity of the company; the size of the blocks of shares involved; the general financial condition of the company, and its business prospects at the time of the gift. We have also accorded appropriate weight to the testimony of the two experts produced by the petitioner, the selling price of the securities of comparable dairy companies, and all other pertinent facts. On the basis of all these factors, we have found as a fact that the value of the preferred shares on the date of the gift was $10 per share and the value of the common stock on the date of its transfer was $1.15 per share. The question of the penalty remains to be disposed of. Section 3612 (d) (1) of the Internal Revenue Code *98 provides that delinquency penalties shall be imposed for failure to file returns within the time required by law or prescribed by the Commissioner, except that when a return is filed and it is shown that the failure to file was due to a reasonable cause and not to willful neglect, no penalty shall be added to the tax. Petitioner's return was prepared before the time for filing but instead of being forwarded to his attorneys, found its way into his personal file at the offices of Foremost Dairies. Business kept him out of town most of the time during the spring of 1944 so that it was some time after March 15, 1944, and before July 5, 1944, when he finally executed the return, that he discovered the return had not been filed when due. Had the return in question been executed by petitioner and misplaced by his secretary, we might be able to find from the facts reasonable cause for his failure to make a timely return. Bouvelt Realty, Inc., 46 B.T.A. 45. In the instant case, however, petitioner had not executed the return on or before the due date and neither his mistaken impression that he had nor the demands of his business on his time can be recognized as a reasonable *99 cause for his failure. He was apparently fully aware that he was liable for tax on the gift and the fact that none was paid constituted notice to him that a return had not been filed. It is also well settled that the burden of filing returns cannot be avoided by placing the responsibility upon an agent. Malcolm Clifton Davenport, 6 T.C. 62; Eagle Piece Dye Works, 10 B.T.A. 1360; Estate of Charles Curie, 4 T.C. 1175. Therefore, it is our opinion that the penalty assessed by respondent for petitioner's failure to make a timely gift tax return was properly imposed. Decision will be entered under Rule 50.