Florence M. Harrison, Transferee, et al. [1] v. Commissioner. Harrison v. Commissioner
Docket Nos. 65163-65166.
United States Tax Court
T.C. Memo 1958-157; 1958 Tax Ct. Memo LEXIS 70; 17 T.C.M. (CCH) 776; T.C.M. (RIA) 58157; August 18, 1958
*70 Held, that the transfer made by decedent in 1952 was not in contemplation of death. Held, further, that the fair market value of the Atlas stock on December 21, 1953 and January 15, 1954 was $585 per share. Edward A. Eisele, Jr., Esq., Williamson Building, Cleveland, Ohio, for the petitioners. James F. Shea, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined transferee liabilities for deficiencies in estate tax for petitioners in Docket Nos. 65163 and 65166 as Transferees of the Estate of Nellie B. Harrison, and for the petitioners in Docket Nos. 65164 and 65165 as Transferees of the Estate of J. F. Harrison, as follows: Docket No.
Deficiency
65163
$20,002.83
65164
10,865.43
65165
10,865.43
65166
20,002.83 The issues in these consolidated cases are (1) the fair market value of certain shares of stock of the Atlas Bolt & Screw Company for Federal estate tax purposes as of approximately January 1, 1954; and (2) whether certain gifts made by J. F. Harrison were in contemplation of death within the meaning of section 811(c)(1)(A) of the Internal Revenue Code of 1939. [2]
*71 Findings of Fact Some of the facts have been stipulated and they are found accordingly. J. F. Harrison died on January 15, 1953, and Nellie B. Harrison, his wife, died on December 21, 1953. Federal estate tax returns for the Estate of J. F. Harrison and Nellie B. Harrison were filed with the district director of internal revenue, Cleveland, Ohio, on March 8, 1954, and on December 31, 1954, respectively. Florence M. Harrison and David H. Harrison, Executor of the Estate of Lee A. Harrison, are jointly and severally liable as transferes within the meaning of sections 827 and 900 for whatever deficiencies in estate tax that there may be held to be due and owing by the two estates. Lee A. Harrison, deceased, and Florence M. Harrison, are the children of J. F. and Nellie Harrison, deceased. David is the grandson of the deceased couple. J. F. Harrison was almost 94 years of age at his death in January 1953. He died of broncho pneumonia, which came as a result of treatments administered to him for a cancerous condition of the left thigh. The cancerous condition was first examined by a doctor in November 1952, at which time the growth on the leg was about the size of a half dollar. *72 In September 1950, J. F. Harrison suffered a coronary thrombosis. When he recovered from the attack he was able to carry on a normal routine. Both before and after the coronary thrombosis he was active and mentally alert. He retired in 1925 from the Atlas Bolt & Screw Company, of which he was one of the founders. During his retirement he went into several business ventures and at all times took an active part in the affairs of Atlas as a member of the board of directors. Lee A. Harrison, from about 1925 until his death, had no regular employment because of arthritis and a heart condition. His only source of income was from investments, including stock in the Atlas Bolt & Screw Company (hereinafter called Atlas), and cash gifts from his father. Florence's sources of income were from music teaching, investment income from stock in Atlas acquired by gift from her father, and cash gifts from her father. For many years, from about 1930 on, J. F. Harrison and his wife resided in the home of their son, Lee, and during this time contributed $50 per week to household expenses and, in addition, paid the utility bills. In 1943 or 1944 Lee was able to take over a greater part of the household *73 bills because of dividends from the Atlas stock which had been given to him by his father. J. F. Harrison, deceased, was very conscious of tax matters, and he frequently consulted with his accountant about possible income tax savings. He was repeatedly advised by his accountant to make gifts of income-producing property to his children in order to save income taxes. He made gifts in 1943 of 180 shares of Atlas stock to Florence and 180 shares to Lee, and he filed gift tax returns for these gifts. Again in 1949 J. F. Harrison made gifts totaling $12,000 to Florence and Lee, and in 1950 he made gifts to them in a like amount. On or about August 8, 1952, he gave stock in Kelley Island Lime & Transport Company to Florence and Lee. The value of this stock was $11,517.80 as of January 15, 1954, the optional valuation date of J. F. Harrison's estate, and the stock remained in the hands of the donees as of that date. Atlas is an Ohio corporation with its principal place of business in Cleveland. On December 21, 1953, the date of the death of Nellie B. Harrison, and on January 15, 1954, the optional valuation date for the Estate of J. F. Harrison, Atlas had 5,000 shares of common stock *74 authorized and outstanding. A total of 670 shares of Atlas stock was held by the estates in the cases before us. At all times material herein, its operations have consisted of a bolt and screw division and a car division. The car division makes special locomotives and special heavy equipment for use in steel mills. The earnings, after taxes, dividends and book value per shares of stock of the corporation for the 22 year period ending June 30, 1954, were as follows: Dividends
Year Ended
Earnings
Paid
Book Value
June 30,
per Share
per Share
per Share
1933
($16.84)
$ 6.50
$197.79
1934
( 13.87)
6.00
177.92
1935
4.58
6.00
176.50
1936
( 5.86)
6.00
167.22
1937
26.28
15.00
178.50
1938
( 6.30)
6.00
177.62
1939
( 6.62)
6.00
177.29
1940
14.86
6.00
180.60
1941
24.11
18.00
186.71
1942
51.41
28.50
209.87
1943
25.11
36.00
198.97
1944
44.00
21.00
201.44
1945
35.61
21.00
236.58
1946
28.20
11.00
235.65
1947
97.77
16.00
303.32
1948
103.13
46.00
357.98
1949
128.39
60.00
426.37
1950
85.52
50.00
461.89
1951
85.35
62.00
485.24
1952
83.99
50.00
519.23
1953
98.97
62.00
556.20
1954
96.33
67.00
585.53
*75 The net current asset value of Atlas on June 30, 1954 was $452 per share. The fair market value of the Atlas plant and land on June 30, 1953 and June 30, 1954 was in excess of $765,000. The depreciated cost of land and buildings of Atlas, including both the car and the bolt divisions, was $113,877.32 and $129,501.95, as shown on the books of Atlas on comparable dates. Comparative balance sheets of Atlas as of the dates June 30, 1953 and June 30, 1954 are as follows: Condensed Balance Sheet as at June 30, 1954 and June 30, 1953
Increase
June 30, 1954
June 30, 1953
Decrease
CURRENT ASSETS: Cash
$1,129,181.48
$1,115,649.32
$ 13,532.16
United States Treasury obligations
40,000.00
261,278.00
221,278.00
Trade accounts receivable - net
389,407.57
528,686.55
139,278.98
Inventories
1,787,400.87
1,942.926.95
155,526.08
Accrued interest on United States Treasury
bonds
122.31
122.31
$3,346,112.23
$3,848,663.13
$502,550.90
PERSONAL AND SUNDRY ACCOUNTS RE-
CEIVABLES
4,889.17
4,029.28
859.89
PLANT AND EQUIPMENT - depreciated cost
640,438.56
581,127.24
59,311.32
DEFERRED CHARGES
23,937.53
15,311.71
8,625.82
$4,015,377.49
$4,449,131.36
$433,753.87
CURRENT LIABILITIES: Trade accounts payable
$ 90,326.51
$ 106,332.28
$ 16,005.77
Accrued salaries and wages
43,098.30
60,576.58
17,478.28
Accrued general taxes
46,628.65
42,631.25
3,997.40
Federal income and excess profits taxes
623,841.79
1,069,446.42
445,604.63
Personal & sundry accts. payable
69,171.42
63,401.68
5,769.74
Advance billings
214,659.82
325,742.57
111,082.75
$1,087,726.49
$1,668,130.78
$580,404.29
CAPITAL STOCK & SURPLUS: Common stock
500,000.00
500,000.00
Surplus
2,427,651.00
2,281,000.58
146,650.42
$4,015,377.49
$4,449,131.36
$433,753.87
*76 The following schedule shows net sales and net profit on sales of Atlas for each of its fiscal years ended June 30, 1949 to June 30, 1954, inclusive: (a) Bolt Division and Car Division combined (total operation): 1949
1950
1951
Net Sales
$4,428,279
$3,766,551
$4,240,063
Net Profit on
Sales
1,030,216
680,211
810,888
1952
1953
1954
Net Sales
$4,975,295
$5,564,086
$5,102,180
Net Profit on
Sales
1,033,374
1,509,419
1,040,339
(b) Car Division (operation of Bolt Division excluded): 1949
1950
1951
Net Sales
$2,767,122
$2,327,382
$1,897,947
Net Profit on
Sales
822,572
627,534
416,953
1952
1953
1954
Net Sales
$2,800,154
$3,697,083
$3,593,641
Net Profit on
Sales
747,854
1,304,839
1,024,111
The transfers by J. F. Harrison to his children in 1952 were not in contemplation of death. The fair market value of the Atlas stock on December 21, 1953 and January 15, 1954 was $585 per share. Opinion The first issue is the fair market value of a total of 670 shares of Atlas stock for estate tax purposes on December 21, 1953 and January 15, 1954. This stock formed part of the gross estates of Nellie *77 B. Harrison and J. F. Harrison. It has been stipulated by the parties that the fair market value was the same on both dates. The respondent, in the statutory notices of deficiency, attributed a value $585of per share to the stock. On brief, the respondent argues that the fair market value of the stock on these dates was "$585.00 or more" per share. The petitioners maintain that the stock had a fair market value of $400 per share, which was the amount reported in the respective Federal estate tax returns. It does not appear from the evidence that this stock was listed on an exchange and it also appears that the 5,000 shares of Atlas stock, which were concentrated in a relatively few hands, were not sold with any great frequency. We must, under the circumstances, examine all relevant factors affecting the value of the stock in order that we may reach a fair market value on the pertinent dates. Estate of Amy H. DuPuy, 9 T.C. 276. Among the relevant factors are the history, management, earnings, dividends, finances and prospects of Atlas. Petitioners contend, as stated, that the stock should be valued at $400 a share. They called two expert witnesses who placed values of *78 $300 and $375 per share on the stock. They indicated that too much stress should not be placed on Atlas' consistently high earning record and its equally consistent record of making substantial dividend payments over the years. There was testimony, based in part upon a comparison with so-called "comparable" companies, to the effect that Atlas was not, in the opinion of the experts, laying aside sufficient portions of its annual earnings in depreciation reserves to keep its plant and equipment modernized and that, consequently, the efficiency of the plant would suffer in the near future. Respondent, on the other hand, points out the earnings and dividend record of Atlas, the extremely liquid nature of the Atlas assets, the absence of preferred stock or long-term indebtedness, and the book value per share of stock. We have examined all the evidence carefully and, as is usual in cases of this kind, such evidence does not all point in the same direction. Witnesses for the petitioners drew comparisons from "comparable" companies, which companies, upon analysis, appeared to be significantly different from Atlas both in the size of their operations and in the nature of their operations. *79 There were other differences as well which we think served to weaken somewhat the opinion of the witnesses. Nor are we persuaded, in view of evidence in the record, that the depreciation policy of Atlas was turning it into an obsolete and inefficient plant. As we indicated above, one of the factors which is extremely relevant in the valuation of stock is the earnings record of the company, and another equally relevant factor is the dividend record of the company. Atlas paid dividends every year from 1933 through 1954, such dividends ranging from $6,50 per share in 1933 to $67 per share in 1954. The dividends paid per share in the years 1950 through 1954 were $50, $62, $50, $62 and $67, respectively. The earnings record of Atlas is similarly impressive. The company showed after-taxes earnings consistently in the years 1940 through 1954 and subsequently to 1947 the earnings per share exceeded $85. A method frequently adopted by the courts, confronted with the problem of the valuation of stock, is to capitalize the earnings at rates varying from 6 per cent to approximately 10 per cent. Virginia v. West Virginia, 238 U.S. 202; Kline v. Commissioner, 130 Fed. (2d) 742, *80 certiorari denied 317 U.S. 697. In the Kline case, supra, the Court said: "The value of a stock is put by many conservative authorities at ten times its annual earnings. Other authorities set the value of a stock at twelve to fifteen times its annual earnings. * * *" In the instant case the average earnings of Atlas for the 5-year period ended June 30, 1954 were approximately $90 per share and this average, capitalized at 8 per cent, would give to the stock a value of $1,125 per share. We do not, of course, confine ourselves to this factor in placing a value on the Atlas stock, but we think it is convincing evidence that the valuation for which the petitioners contend is unrealistic. We are persuaded, after an examination of all the pertinent factors, that the fair market value of the Atlas stock on the two dates relevant here was $585 per share, which is the value placed upon the stock by the respondent in his statutory notices of deficiency to the petitioners. The next issue is whether the transfer by J. F. Harrison of stock in the Kelley Island Lime & Transport Company to his son and daughter in August 1952, approximately five months prior to his death in January *81 1953, was in contemplation of death within the meaning of section 811(c)(1)(A). The statute creates a presumption that a transfer, without consideration, by the decedent within three years of his death is deemed to be in contemplation of death, unless shown to the contrary. The phrase "contemplation of death" does not mean the general expectation of death which all entertain. United States v. Wells, 283 U.S. 102. In that case the taxpayer established a policy over the years 1901 to 1921 of making gifts to his children from a large estate. The respondent attacked certain transfers made in 1919 and 1921. In April 1920 the taxpayer was afflicted with ulcerative colitis and he was advised by his physician that he would recover. He was discharged from the hospital in September 1920 and resumed his normal business activities. He reentered the hospital in December 1920 and was discharged in January 1921. He reentered a hospital in June 1921, where he failed to respond to treatment and he died in August 1921, at the age of 73. The Supreme Court, in the circumstances of that case, held that the 1919 and 1921 transfers were not made in contemplation of death. The Supreme Court *82 laid down the following principle: "As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may posseess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to to an apprehension that death is 'near at hand.'" We think that the *83 Wells case is particularly pertinent here. J. F. Harrison, over the years, had made gifts to his children, who were unable by themselves to earn a living. In 1943 he gave 180 shares of Atlas stock to each of his two children. In the ensuing years there were other gifts, within the $3,000 annual exclusion, to his children. In 1949 he made gifts totaling $12,000 to his two children and in 1950 he made gifts to them of a like amount. In our opinion, this pattern definitely establishes a pattern of making gifts to his children without any motive of impending death. It is obvious to us that his motives for making the gifts were associated with the thought of sustaining his children and also to enable them to create some small estate for themselves. We think that the gift of stock in August 1952 was within this established pattern. We do not think that his coronary thrombosis in 1950 compels us to hold that his gifts in 1952 were in contemplation of death. The evidence shows quite clearly that he recovered fully, and, in fact, it is the doctor's testimony that his recovery was remarkable. After the attack J. F. Harrison resumed his normal activities. Nor is there anything in the record to *84 show that the cancerous condition in his thigh prompted J. F. Harrison to make these gifts. The gifts were made in August and it was not until November of that same year that the doctor diagnosed the lump in the thigh as a cancer. In the Wells case, supra, it is stated "the statute does not embrace gifts inter vivos which spring from a different motive" (other than in contemplation of death). There is testimony here that decedent was moved to make the gifts in question of incomeproducing property, in order to reduce his income tax and still keep the income within the family group. Decedent's accountant, who advised him in tax matters, testified to the effect that decedent was "always very conscious of tax matters." The accountant testified that, as early as 1940, he had advised J. F. Harrison to make his gifts in such a way as to reduce income taxes and that this advice was followed. The accountant said that J. F. Harrison "was making gifts out of his own income whereas if he had transferred income-producing property, he would have saved money taxwise and we talked to him about that before and after he made gifts." It is clear from the record that J. F. Harrison acted with this *85 advice in mind and that his motive in making the transfers through the years, including the transfers here in dispute, was to save income taxes. This motive, of course, is perfectly consistent with his desire to assist his children. In Estate of May Hicks Sheldon, 27 T.C. 194, where the taxpayer was 80 years of age when she died, there was evidence that the decedent's financial adviser "'recommended some plans to reduce her income tax'" and that he "'recommended specifically that she make a gift for the benefit of her daughter which we estimated would save for the family between herself and her daughter over $7,900 a year in income tax.'" The transfers were made soon after this advice was given and this Court indicated that it was "fair to infer she obtained her motivation from that cause." It is clearly established that a purpose to save income taxes while at the same time retaining the income in the family is one associated with life and contradicts any assumption of contemplation of death. Estate of May Hicks Sheldon, supra; Estate of Charles J. Rosebault, 12 T.C. 1; Estate of Genevieve Brady Macaulay, 3 T.C. 350, affirmed 150 Fed. (2d) 847. *86 In view of all the facts we hold that the transfer of the stock in August 1952 by J. F. Harrison to his children was not made in contemplation of death. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: FLORENCE M. HARRISON, Transferee, Docket No. 65164; ESTATE OF LEE A. HARRISON, DAVID H. HARRISON, Executor, Transferee, Docket Nos. 65165 and 65166.↩
2. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩