Estate of Lida R. Tompkins, The Riggs National Bank of Washington, D.C., Allan D. Henry, and James Sherier, Executors, d.b.n. v. Commissioner.
Estate of Tompkins v. Commissioner
Docket No. 69467.
United States Tax Court
T.C. Memo 1961-338; 1961 Tax Ct. Memo LEXIS 9; 20 T.C.M. (CCH) 1763; T.C.M. (RIA) 61338; December 22, 1961
*9 Stanley Worth, Esq., and Jules G. Korner, III, Esq., 404 Transportation Bldg., Washington, D.C., for the petitioner. Paul E. Waring, Esq., for the respondent. KERN mined a deficiency in the Federal estate tax due from decedent's estate in the year 1953 in the amount of $2,160,256.47. The greater part of that deficiency and the only part here in issue results from respondent's determination that the fair market value of certain shares of corporate stock owned by the decedent at the date of her death was $2,367,008.10. Petitioner assigns that determination as error. Numerous other determinations made by respondent relative to the fair market value of other property and corporate stocks owned by the decedent at the date of her death were also assigned as error in the petition, but the parties have since agreed upon and stipulated the values of those shares to be used in the Rule 50 computation. In an amendment to the petition the petitioner assigned as further error the respondent's reduction in the credit for state inheritance taxes from $53,722.76 to $49,826.43. The parties subsequently stipulated that the amount of attorneys' fees and costs of administration, as *10 well as the proper credit resulting from the payment of "inheritance, succession or estate taxes" to any state or the District of Columbia, will be ascertained and given effect in the course of the computation under Rule 50. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner is the estate of Lida R. Tompkins, deceased. One of the executors - The Riggs National Bank of Washington, D.C., - is a corporation with its principal office located in Washington, D.C. The decedent's husband, Charles H. Tompkins, sometimes hereinafter referred to as Tompkins, was named as executor in her last will and testament, and while acting in that capacity he filed a Federal estate tax return on behalf of her estate on May 28, 1954, with the district director of internal revenue at Baltimore, Maryland. Tompkins died before this proceeding began and, in accordance with the provisions of decedent's will, Allan D. Henry, James Sherier, and The Riggs National Bank of Washington, D.C., qualified and are acting as decedent's executors and trustees. The *11 decedent, Lida R. Tompkins, died testate on January 28, 1953, a resident of Washington, D.C. For at least 40 years prior to her death she had been active in the affairs of a construction firm organized and controlled by her husband, known as the Chas. H. Tompkins Co., sometimes hereinafter referred to as the Tompkins Co. Although she was not an engineer, she had studied architecture and was active in the planning of various construction projects undertaken by the firm as well as the more routine business operations and internal management of the company's affairs. At the date of her death decedent owned, among other things, 186 of the 650 outstanding shares of no-par common stock of the H Street Building Corporation, hereinafter referred to as H Street, of Washington, D.C. H Street was incorporated under the laws of Delaware on October 24, 1940, with an authorized capital stock of 3,000 shares of 5 percent preferred stock of $100 par value and 10,000 shares of no-par-value common stock. H Street was a close corporation and all of its stock was held for or by members of the Tompkins family. The stock is not listed on any exchange and there are no known sales of the stock either within *12 or without the family group. The following is a list of stockholders of H Street as of January 28, 1953: Stockholders
Relationship
Common
Preferred
Chas. H. Tompkins
186
540
Lida R. Tompkins
186
540
Francis M. Tompkins
son
35 1/2
67 1/2
Gladys B. Tompkins
daughter-in-law
3
Francis M. Tompkins, 3rd
grandchild
11
Louise T. Parker [1]
daughter
35 1/2
67 1/2
Andrew Parker
son-in-law
3
Louise C. Parker, Jr.
grandchild
11
Andrew Parker, Jr.
grandchild
11
Brainard W. Parker, 2nd
grandchild
11
Emma T. Matheson
daughter
35 1/2
67 1/2
Malcolm Matheson, Jr.
son-in-law
3
Emma H. Matheson, Jr.
grandchild
11
Malcolm Matheson, 3rd
grandchild
11
Harriet Torrey Matheson
grandchild
11
Charles Tompkins Matheson
grandchild
11
Lida Roberta Matheson
grandchild
11
William John Matheson
grandchild
3
Chas. H. Tompkins, Jr.
son
35 1/2
67 1/2
Lalla Rook Tompkins
daughter-in-law
3
Chas. H. Tompkins, 3rd
grandchild
11
Lalla Rook Tompkins, Jr.
grandchild
11
Total
650
1,350 The 186 shares owned by the decedent represented a minority interest of 28.6 percent *13 of the common stock of the corporation. All of the authorized preferred stock was issued at the time of incorporation. At a special meeting of H Street's board of directors held on December 3, 1942, the treasurer was authorized to redeem 5 percent of the outstanding preferred stock on December 31, 1942. Such a redemption was authorized by article 4 of the certificate of incorporation. At another special meeting of the corporation's directors held on December 6, 1943, the treasurer was authorized to redeem another 150 shares of the outstanding preferred stock. The practice of redeeming 150 shares of preferred stock was continued each year thereafter, and at the date of decedent's death only 1,350 shares of preferred stock were outstanding. During the year 1952 Tompkins was president of H Street and the decedent was vice president. Both were directors of the corporation, but neither received any salary or other compensation as a result of the offices held in H Street. Louise C. Parker was the remaining director and also served as secretary-treasurer at a salary of $4,800 annually. Charles H. Tompkins, Jr., was the assistant secretary and received a salary of $2,400 annually. H Street *14 had no other employees and no offices of its own, but made a flat payment that varied from $1,200 to $1,500 a year to the Tompkins Co. as remuneration for services rendered H Street by employees of the Tompkins Co. Generally, Lida and her husband acquired property on H Street's behalf and did all of the planning and leasing of its property, but almost everything else, including insurance matters and operation of the buildings owned by H Street, was done by employees of the Tompkins Co. Subsequent to the death of decedent and her husband the payments made to the Tompkins Co. by H Street were increased to $15,000 annually. No dividends have ever been paid on the H Street common stock. The dividends due on the preferred stock have been paid annually at the rate of $5 per share. The following table summarizes the operations of H Street in the period between 1942 and 1952, inclusive: H STREET BUILDING CORPORATION
Dividends
Year
Gross Income
Net Income
Preferred
Common
1942
$289,540.56
$ 41,631.71
$15,000
1943
304,067.40
47,305.96
14,250
1944
304,698.39
49,870.89
13,500
1945
306,082.62
55,667.51
12,750
1946
311,357.30
84,420.13
12,000
1947
404,664.22
119,931.89
11,250
1948
413,045.30
103,156.28
10,500
1949
424,609.41
130,838.03
9,750
1950
423,790.08
128,263.44
9,000
1951
422,688.27
97,876.56
8,250
1952
489,088.92
129,089.78
7,500
*15 H STREET BUILDING CORPORATION
Earned Sur-
Capital
Year
plus [1]
Stock
Net Worth
1942
$ 71,764.61
$350,000
$ 421,764.61
1943
117,679.60
335,000
452,679.60
1944
154,306.49
320,000
474,306.49
1945
204,703.45
305,000
509,703.45
1946
262,163.11
290,000
552,163.11
1947
396,492.21
275,000
671,492.21
1948
478,826.96
260,000
738,826.96
1949
618,513.46
245,000
863,513.46
1950
741,461.87
230,000
971,461.87
1951
834,473.13
215,000
1,049,473.13
1952
996,317.57
200,000
1,196,317.57
The balance sheet of H Street as of December 31, 1952, indicated the following: ASSETS
Cash
$ 12,894.82
Notes Receivable
364.95
Advances to Special Ac-
counts
595,944.50
Stock
355,044.07
Depreciable Assets (Net)
1,035,478.88
Land
1,326,414.23
Other Assets
12,356.96
Total
$3,338,498.41
LIABILITIES
Notes Payable
$ 520,000.00
Other Liabilities
2,712.70
Mortgage Payable
1,619,468.14
Capital Stock: Preferred
$135,000
Common
65,000
200,000.00
Earned Surplus
996,317.57
Total
$3,338,498.41
*16 Among the purposes for which H Street was organized were the "buying, leasing and otherwise acquiring" of lands, to "conduct a general building, contracting and construction business," and "[to] conduct a general real estate business." As indicated by the balance sheet, H Street's assets on December 31, 1952, consisted primarily of certain depreciable assets, its investment in the stock of and advances to some subsidiary corporations, and unimproved land. The depreciable assets included an office building located at 1818 H Street, N.W., Washington, D.C., which was built in 1940 and leased to the International Bank for Reconstruction and Development. The land upon which this building was constructed cost $450,000. The building itself cost $1,541,675.86, and after allowances for depreciation in the amount of $556,673.82 the book value on December 31, 1952, was $985,102.04. The original lease was renewed in December 1946 and again in December 1951. The last renewal was for a 10-year term and provided for an annual rental of $445,529.38 per annum, payable monthly, which amount was a substantial increase over the rent in the previous lease. This building was originally financed by *17 a loan from the Reconstruction Finance Corporation, but in 1947 it was mortgaged for 15 years to The Mutual Life Insurance Company of New York for $2,000,000. Concurrently with the execution of this mortgage, the lease between H Street and the International Bank for Reconstruction and Development was assigned to The Mutual Life Insurance Company of New York. The fair market value of 1818 H Street as of the date of decedent's death was stipulated to be $3,500,000. H Street also owned two buildings located at 718 and 722 18th Street, N.W., Washington, D.C., which were acquired in 1941. The land upon which these buildings were located cost $74,196.75. The buildings cost $97,564.19 and, after allowances for depreciation in the amount of $47,187.35, the book value on December 31, 1952, was $50,376.84. These buildings were leased to the International Monetary Fund for a period of 10 years at an annual rent of $38,065.50, payable monthly, according to the terms of a lease executed on December 6, 1951. These buildings were also included in the deed of trust given to The Mutual Life Insurance Company of New York as security for its loan of $2,000,000 to H Street in 1947. As indicated on *18 the balance sheet, the unpaid balance on this loan as of December 31, 1952, was $1,619,468.14. The fair market value of 718 and 722 18th Street, as of the date of decedent's death, was $400,000. Sometime during or prior to 1946 Morris Cafritz, hereinafter referred to as Cafritz, the principal stockholder in a corporation known as Ambassador, Inc., and Tompkins agreed that Ambassador, Inc., and H Street should join in the purchasing of two tracts of unimproved land known as the West Tract and Temple Heights. Each corporation was to hold a 50 percent undivided interest in these tracts as an equal tenant in common. Ambassador, Inc., was not in any way related to H Street or its stockholders, but was controlled and owned entirely by Cafritz and members of his family. The corporations bought these two tracts for the purpose of developing them at some future time when such development became profitable. The two tracts were not bought or held for the purpose of reselling them, either in whole or in part. The West Tract consisted of approximately 189 acres in Arlington County, Virginia. It was purchased by the two corporations in 1946 for $1,125,000, one-half of which was paid by H Street. *19 Between 1950 and 1952 additional adjoining parcels were acquired by H Street and Ambassador, Inc., as equal tenants in common, consisting of 163,875 square feet. The cost of these additional parcels to H Street was $103,811.10. In 1952 approximately 31 acres of the original 189-acre tract, as well as the parcels acquired between 1950 and 1952, were transferred to 14 subsidiary corporations organized and controlled by Ambassador, Inc., and H Street. These 31 acres lay on the eastern side of the original West Tract. The undivided one-half interest in the remaining portion of the West Tract, consisting of approximately 158 acres or 6,890,491 square feet, was carried on H Street's books at $306,594.01 as of December 31, 1952. When acquired by H Street the West Tract was a low-lying tract of land, swampy in places, with meandering streams running through the entire property, and at some points the surface was considerably below street level. Portions of the tract had been used in the past as pits for the extraction of clay for use in making brick. In January 1953 these pits had not been refilled. The West Tract, by which term reference is made to the 158 acres remaining after the transfers *20 to the subsidiaries, was across the Potomac River from Washington, D.C., and it could be reached from the central business district of Washington in about 10 minutes by automobile by way of the 14th Street Bridge. The Washington National Airport, a railroad, and a major north-south Federal highway were in the immediate vicinity of the tract. On the east the tract adjoined the property which had been conveyed to the 14 subsidiary corporations and which had been zoned "industrial." To the south lay certain other industrial areas. On the west it adjoined residential property located on higher ground. To the north was a considerable roadway complex leading to the Pentagon Building. With the exception of 8 acres, the entire tract was zoned for garden-or elevator-type apartments. The other 8 acres were zoned for general commercial usage. It was a "Floating C-3" zone, which might be located anywhere within the tract, depending upon the approval of the developer's plans by the zoning authorities. In 1952 the Federal Housing Authority refused to approve the West Tract as a site for apartment development with FHA financing because of its condition, location, and lack of adequate access. *21 Prior to developing the West Tract, it would be necessary for Ambassador, Inc., and H Street to develop an adequate access by road, to provide for drainage of surface water, and to install a sewerage system. These tasks were complicated by the action of the Bureau of Public Works in restricting access to Army-Navy Drive, which bordered the tract, and Arlington County's lack of available funds to assist in the construction of the drainage and sewerage facilities. Because of the low-lying character of the tract, the drainage system had to accommodate additional surface water from nearby land of higher elevation owned by others, thus increasing its cost. It was necessary to meet criteria imposed by the county officials, who agreed to supervise the construction of the project if Ambassador, Inc., and H Street would pay for it. The project was known as the Relee Storm and Sanitary Sewer Project, and it was substantially completed by December 17, 1952. The cost was shared by the two corporations, each paying $199,647.30 to Arlington County. The Relee Project, as thus constructed, was essential to the entire drainage problem of the West Tract, but it did not provide complete drainage *22 for the entire tract. On the western part it was necessary to construct swales to channel the water to the sewer openings and, as a temporary expedient, open ditches were dug. After January 1953 they were closed and replaced by a more permanent system of connecting sewer lines. However, by December 17, 1952, the level of the surface water had been lowered considerably by the Relee Sewer Project. On January 28, 1953, the West Tract was otherwise unimproved and ungraded; it contained a central depression, and the balance was gently rolling or flat. Since 1953 about 350,000 cubic yards of fill dirt have been moved to the tract, and the entire property presents a greatly improved appearance compared to its condition in early 1953. In 1953 the assessed value of the West Tract for county tax purposes was $478,500. While there were a number of sales in Arlington County, Virginia, of properties zoned for apartments during the years pertinent herein, the properties sold were not comparable to the West Tract because of the unique character of the latter due to its size, location, topography, and the problems, financial and physical, incident to its development. The commercial portion of *23 the West Tract consisted of 8 acres. There were no comparable sales of commercially zoned property in the vicinity of the West Tract during the years pertinent herein. After deducting the acreage required for the streets and roads dedicated to Arlington County and running throughout the West Tract, 146.7443 acres remained to be used for development purposes. The fair market value of an undivided one-half interest in the available acreage remaining in the West Tract on January 28, 1953, was $1,250,000. In 1946 H Street and Ambassador, Inc., also acquired the Temple Heights property at an aggregate cost of approximately $1,000,000, each owning an undivided one-half interest as a tenant in common. This land was also unimproved and consisted of 335,495 square feet located on Connecticut Avenue between Florida Avenue and Columbia Road and extending east to 19th Street in Washington, D.C., officially described as Square 2535, Lots 827 and 828. It is approximately 3 blocks north of Dupont Circle and 8 blocks north of the intersection of Connecticut Avenue and K Street. For purposes of determining the real estate taxes due on the property, the District of Columbia assessed Lot 827 at $275,183 *24 and Lot 828 at $270,506 during the second half of the fiscal year 1953. On December 31, 1952, H Street's books reflected its investment in Temple Heights at $495,623.47, which is substantially the cost of the land, the only difference being a minor one representing legal fees and other costs which were incurred and capitalized between the date of acquisition and the date of decedent's death. In 1947 and continuing through 1953 the south part of the Temple Heights property was zoned for commercial use and the north part was zoned for apartment use. The commercial portion consisted of 110,073 square feet which was assessed for tax purposes at $2.50 per square foot. The portion zoned for apartments consisted of 225,422 square feet assessed for tax purposes at $1.20 per square foot. The total tax assessment for the entire tract was $545,689. There was a 90-foot height-of-building limitation on the entire tract. A street running east and west through the property (to be known as T Street) had been dedicated but had not been constructed. Immediately to the south of the Temple Heights property was a neighborhood of small shops, to the west were some old townhouses and a church, to the *25 east was an undesirable residential neighborhood including a public school, and to the north was the Wyoming Apartment House, a 7-story building erected 50 years ago. Farther to the north and west were newer and better apartments and, farther still to the west and extending from a few blocks west of Connecticut Avenue to Massachusetts Avenue, an exceptionally desirable residential neighborhood. On the southern perimeter of Dupont Circle was an office building; farther south on Connecticut Avenue at M and N Streets were newer office buildings; and still farther south on Connecticut Avenue at K Street were new office buildings. Transportation facilities on Connecticut Avenue were excellent. The location and topography of the tract complicated its development. There was a considerable upward slope from Florida Avenue to Columbia Road and the frontage on 19th Street was quite steep; also, the subsoil was very rocky. There had been many ideas about developing Temple Heights, and some even approached the planning stage, but all of these projects had been subsequently discarded, and at the date of decedent's death no decisions had been made and no preliminary plans were being drawn up for *26 development of the Temple Heights Tract. The tract was not ready for development in 1953, and only a portion of it had been developed at the time of this proceeding. While there were a number of sales of properties in the general neighborhood of the Temple Heights Tract during the years pertinent herein, the properties sold were not comparable to the Temple Heights Tract because of the unique character of the latter due to its size, location, topography, and the problems, financial and physical, incident to its development. The fair market value of an undivided one-half interest in the Temple Heights property as of the date of decedent's death was $850,000. Beginning in May 1952 H Street and Ambassador, Inc., acting together, organized 14 subsidiary corporations under the laws of the State of Delaware, each of which subsequently qualified to do business in the State of Virginia. Each of these 14 corporations had 250 authorized shares of $100 par-value common stock. As of December 31, 1952, 20 shares of stock were issued by each corporation to H Street and Ambassador, Inc., each receiving 10 shares. Both H Street and Ambassador, Inc., made advances to or for the use of these 14 *27 corporations, each contributing an equal amount. On its balance sheet H Street carried these advances in an asset account labeled "Advances to Special Accounts," which totaled $595,944.50 as of December 31, 1952. This account consisted of the undistributed construction costs of 8 warehouses which were being built for 8 of the corporations in the amount of $341,515.08; miscellaneous other advances for all 14 corporations in the amount of $1,195.61; H Street's share of the cash balance in a bank account which was used jointly by H Street and Ambassador, Inc., on behalf of the subsidiary corporations, amounting to $55,858.92; and the remaining $197,374.89 represented advances or costs which had been distributed to specific corporations. Sometime after these 14 corporations were formed, H Street and Ambassador, Inc., transferred various portions of the original West Tract to these corporations in exchange for stock. By December 31, 1952, the Tompkins Co. had begun construction of warehouses for the 8 corporations which were designated by various addresses on Ferne Street and for which these 8 corporations were charged only the actual cost of construction. On the date of decedent's death *28 these warehouses were 90 percent completed. There were no contracts for the rental or any other agreements with any prospective lessee or lessees for the use of these buildings. When originally planned the builders anticipated leasing the warehouses to the Federal Government, but they were underbid by another firm. The remaining 6 corporations held only vacant land on January 28, 1953. The following is a summary of the funds advanced and the stock held by H Street in all 14 corporations: Date of Incor-
Funds Ad-
Amount of
poration
Name of Corporation
vanced
Stock
7/30/52
1200 Eads St., Inc.
$ 26,423.13
$ 34,109.00
8/11/52
1400 Eads St., Inc.
28,452.14
36,727.79
7/30/52
1101 S. Fern St., Inc.
37,931.11
48,963.83
7/30/52
1101 Eads St., Inc.
103,811.10
7/30/52
Arna-Eads, Inc.
26,389.27
34,064.91
7/30/52
Arna-Fern, Inc.
28,675.59
37,016.22
5/ 6/52
1421 S. Ferne St., Inc.
6,421.80
7,845.77
5/ 6/52
1411 S. Ferne St., Inc.
5,808.96
7,054.67
5/ 6/52
1401 S. Ferne St., Inc.
5,808.96
7,054.66
5/ 6/52
1311 S. Ferne St., Inc.
5,808.95
7,054.67
5/ 6/52
1301 S. Ferne St., Inc.
5,808.96
7,054.66
5/ 6/52
1221 S. Ferne St., Inc.
5,808.95
7,054.67
5/ 6/52
1211 S. Ferne St., Inc.
5,977.42
7,272.12
5/ 6/52
1201 S. Ferne St., Inc.
8,059.65
9,960.00
Total
$197,374.89
$355,044.07
Undistributed construction costs for 8 warehouse
341,515.08
corporations
Other advances for 14 corporations listed above
1,195.61
Cash balance (H St.'s share)
55,858.92
Total
$595,944.50
*29 The parties stipulated that the unimproved land held by the 6 corporations had a fair market value of $870,179 as of the date of decedent's death. They further stipulated that the fair market value of the land and improvements held by the remaining 8 corporations as of the date of decedent's death was $1,332,000. The land transferred to all of the corporations except 1101 Eads Street, Inc., represents an allocated portion of the cost to H Street and Ambassador, Inc., of the original cost of the land transferred, plus certain other additions to basis, including the cost of the Relee Storm and Sewer project. The land transferred to 1101 Eads Street, Inc., cost H Street $103,811.10. It consisted of two tracts referred to as the Sam Strause property which H Street acquired in October 1950 and the Waterloo property which was acquired in May 1952. Certain miscellaneous accounts appearing on H Street's balance sheet on December 31, 1952, included $12,356.96 in an account labeled "Other Assets." This account represented certain lease expenses, prepaid insurance, and some railroad track equipment. In the fall of 1952 and concurrent with the beginning of the development program at the *30 so-called Pentagon Industrial Center, which was the collective name applied by the developers to the site of the land held by the 14 corporations, H Street borrowed a total of $520,000 from The Riggs National Bank and the Hamilton National Bank. Of this amount $390,000 was borrowed from The Riggs National Bank on several 90-day notes bearing interest at 3 percent which were endorsed by both decedent and her husband. The remaining $130,000 was borrowed from the Hamilton National Bank on a single demand note which was also to bear interest at the rate of 3 percent. This note was also endorsed by the decedent and her husband and secured by the pledge of 628 shares of Riggs National Bank stock as collateral. An account appearing on H Street's balance sheet, labeled "Other Liabilities," in the amount of $2,712.70 represented taxes withheld in the amount of $212.70 and a deposit on an option in the amount of $2,500. On the Federal estate tax return filed on behalf of decedent's estate on May 28, 1954. the 186 shares of stock in H Street held by the decedent upon the date of her death were valued at $155,193 or approximately $834 per share. Respondent, in his statutory notice of deficiency, *31 attributed a value of $12,725.85 per share to the stock. On brief he argues that the fair market value at the date of death was $8,000 per share. The petitioner now maintains that the stock had a fair market value not in excess of $1,920 per share. The fair market value of the 186 shares of stock in H Street on the date of decedent's death was $5,500 per share. Opinion KERN, Judge: The valuation of stock in a closely held family corporation is always a difficult question. [1] In the instant case the difficulty is compounded because a substantial part of the corporation's assets consists of unimproved land, which is itself difficult to value. In order to arrive at a value for the stock a number of relevant factors must be considered, one of which includes the fair market value of the underlying assets, and before we can place a valuation on the stock we must first ascertain the fair market value, as of the date of decedent's death, of H Street's undivided one-half interest in two tracts of unimproved land owned by H Street and Ambassador, Inc., as tenants in common, and known as the West Tract and Temple Heights.
*32 One fact, in our opinion, is clearly established by the voluminous testimony with regard to the valuation of these properties, and that is that both properties were unique in that they differed from other properties alleged to be comparable in size, location, topography, and problems incident to their proper and profitable development. Therefore, testimony relating to the prices obtained for other properties in the general area was of little help to us in our inquiry except as ultimate checks on the opinion testimony of the expert witnesses called by both parties. We heard this testimony with interest and have studied with care the transcript of it. All of these witnesses impressed us as being intelligent and conscientious and several of them were eminent in their field of expert knowledge. However, as is not unusual, they differed in their opinions and conclusions. These differences resulted from different approaches to the problem of valuation, different methods, and differing emphases placed by them on the facts. As is also not unusual, we have not found it possible to agree in toto with the conclusion of any of the expert witnesses, even though all of their testimony was interesting *33 and to some extent helpful in our consideration of the problem involved. Using our best judgment, based upon all of the facts of record, and our consideration of all the pertinent factors proper in making a valuation of property, including those suggested to us by the parties on brief, we have reached the conclusions stated in our findings as to the value as of the date of decedent's death of the undivided one-half interests of the H Street Building Corporation in the so-called West and Temple Heights properties. Having made these findings it would be a simple matter of computation to determine the value of the H Street stock if the only factor to be considered in such valuation were the fair market value of its underlying assets. However, this is only one of many factors. Ray Consol. Copper Co. v. United States, 268 U.S. 373; William R. Stewart, Jr., et al., Executors, 31 B.T.A. 201; Commissioner v. McCann, 146 F. 2d 385; Richardson v. Commissioner, 151 F. 2d 102, 105; Schlegel v. United States, 71 F. Supp. 495; Laird v. Commissioner, 85 F. 2d 598, 601; and Estate of Amy H. DuPuy, 9 T.C. 276. *34 A partial listing of such factors has been made in Rev. Rul. 59-60, 1959-1 C.B. 237. See also section 811(k), Internal Revenue Code of 1939. [2]
We have been especially concerned with the statutory admonishment of "taking into consideration, in addition to *35 all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange." In the trial of this case a great deal of testimony was adduced, particularly by the respondent, with regard to the selling prices on exchanges of the stock of other corporations which could be classified as real estate holding corporations. Aside from this generic classification, few or no similarities between H Street and the other corporations (or even between the other corporations) were shown. None were operating in the Washington area. There is no indication that their properties were comparable to the properties of H Street other than the statements that some of them owned both improved and unimproved properties. The fair market value of their properties was not shown. Some of them owned operating hotels. Price-earnings ratios differed greatly and obviously reflected the earnings history and potentiality of the individual corporation rather than a pattern common to real estate holding corporations. Although we have given careful consideration to this testimony, we have found it to be of little or no help to us in answering the *36 ultimate question of fact before us, i.e., what was the fair market value of the stock here involved as of the date of decedent's death. This stock constituted a minority interest in a family-owned, closely held corporation. A considerable part of the assets of the corporation consisted of undivided one-half interests in unimproved real estate. It was not adequately capitalized and the relationship between current assets and current liabilities was bad. There had been no sales of this stock and there was no apparent market for it. No dividends had been paid on it, none were contemplated at the time of decedent's death, and the indications were that the management of the corporation was not interested in the payment of dividends. Neither of the two pieces of unimproved real estate in which the corporation held an undivided one-half interest was ready for development, and the best estimate was that it would be 10 years after decedent's death before either would be ready. When and if that time came, the proper development of each would entail grave problems, financial and physical, which would be challenging even to the excellent management of the corporation. The character of that *37 management might be changed by death and might be affected by disagreements with regard to the unimproved real estate between its two equal co-owners. Petitioner on brief contends that under the facts and circumstances of the instant case the fair market value of the assets owned by the corporation should be ignored as an element to be considered in resolving the issue of the fair market value of the corporation's stock as of the date of death. With this contention we are unable to agree. However, we are of the opinion that the fair market value of the corporation's assets is only one factor and not necessarily a controlling factor in determining the value of the stock. Estate of Amy H. DuPuy, supra.We must also consider many other factors. In considering the question of the fair market value of property under facts similar to those in the instant case, our ultimate determination must necessarily be in the nature of a jury verdict. It is necessary for us to consider all the factors pertinent to the question of value, but it is impossible to give an exact percentage weight to each of the factors considered. Many of the factors referred to by us in the last preceding *38 paragraph tend to support petitioner's suggested figure as to value, while others, including the value of the corporation's underlying assets, tend to support the figure suggested by respondent. To paraphrase the language of Judge Murdock in Estate of Amy H. DuPuy, supra at 284, the evidence does not lead irresistably to any amount as the obviously correct value, but a finding of a precise amount must be made. It is our best judgment, after considering to the best of our ability all of the evidence in the case and all of the factors suggested by the parties, that the value of H Street Building Corporation stock on the valuation date was $5,500 per share. Decision will be entered under Rule 50. Footnotes
1. Sometimes referred to as Louise C. Parker.↩
1. Earned surplus does not reflect any accrued Federal income and excess profits taxes. The corporation kept its books and filed its returns on the cash receipts and disbursements basis.↩
1. As we said in Estate of Leonard B. McKitterick, 42 B.T.A. 130, 136↩, "[fair market] value is a fact, the determination of which is, at least, generally difficult. The result is rarely satisfactory."
2. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - (k) Valuation of Unlisted Stock and Securities. - In the case of stock and securities of a corporation the value of which by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.↩