Estate of Ethel C. Dooly, Margaret Dooly Olwell and Jane Dooly Gile, Executrices v. Commissioner.
Dooly v. Commissioner
Docket No. 1113-69.
United States Tax Court
T.C. Memo 1972-164; 1972 Tax Ct. Memo LEXIS 92; 31 T.C.M. (CCH) 814; T.C.M. (RIA) 72164; August 3, 1972
*92 Held, in determining the value of stock in a ranching corporation, asset value was not the sole determinant but was considered along with other factors such as earnings and dividends; and the possibility that the ranch would be purchased for a public park or monument was too speculative and uncertain to be considered. Stephen H. Anderson and Alonzo W. Watson, Jr., Suite 400 Deseret Bldg.; 79 S. Main St., Salt Lake City, Utah, for the petitioners. Eugene P. Bogner and David R. Brennen, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, *93 Judge: The respondent determined a deficiency of $244,462.29 in the Federal estate tax of the Estate of Ethel C. Dooly. Many of the issues have been settled, and the only issues to be decided concern the valuation as of October 7, 1964, of two blocks of Island Ranching Company stock, a majority and a minority block, neither of which represented voting power sufficient to bring about the liquidation of the corporation. Findings of Fact Some of the facts were stipulated, and those facts are so found. The petitioners, Margaret Dooly Olwell and Jane Dooly Gile, are the executrices of the estate of Ethel C. Dooly. The petitioners maintained their legal residences in Salt Lake City, Utah, at the time that the petition was filed in this case. The estate tax return of the estate of Ethel C. Dooly (the decedent) was filed with the district director of internal revenue, Los Angeles, California. The decedent died on October 7, 1964, owning 64.333 shares of stock of Dooly Corporation and 9,690 shares of Island Ranching Company (Island Ranching). The assets of the Dooly Corporation on October 7, 1964, included 50,010 shares of stock of Island Ranching. The valuation of those shares of stock *94 is the only issue remaining with regard to the value of the decedent's interest in the Dooly Corporation. 815 Island Ranching is a closely held Utah corporation which was incorporated in 1884 and which had 100,000 shares of common voting stock outstanding at the time of the decedent's death. Throughout its existence, Island Ranching has actively conducted a ranching business. It has leveled, tilled, and drained land, planted crested wheat, rotated grazing, cross-bred cattle, and participated in soil conservation seminars. In 1964, the corporation owned 25,580.66 of the 26,250 acres on Antelope Island, the Skull Valley ranch, and the Castle Rock ranch. Antelope Island and Skull Valley ranch are located in Utah while Castle Rock ranch is located in Utah and Wyoming. The corporation leased additional properties for ranching purposes in Utah and Idaho, and a substantial portion of these properties were leased on a year-to-year basis with no guarantee of future renewals. During all the years pertinent to this case, the cattle grazed in Castle Rock and on leased land during the summer months, and on Antelope Island, in Skull Valley, and on other leased land during the winter months. *95 The cattle were transported between the summer and winter ranges by truck. The distance from Antelope Island to Castle Rock is approximately 150 miles and from Skull Valley to Castle Rock, approximately 75 miles. Since about 1940, when Mr. William H. Olwell became manager of the corporation, Island Ranching has generally made a profit from its ranching business. For the 5 years preceding 1964, the corporation had net income of $22,044, $20,796, $943, $13,076, and - $12.520 per year. During that same period of time, the corporation paid only one dividend - 10 cents per share in 1959. The poorest year for meat marketing in the decade from 1960 to 1970 was 1964, and during that year, Island Ranching, for the first time in its history, had no buyers for its cattle. It, therefore, sent its cattle to Nebraska for prime finishing at feedyards, and these cattle were sold in 1965. Antelope Island was, in 1964, and has always been, the headquarters of Island Ranching. It is an island approximately 17 miles long and 3 miles wide, located in the Great Salt Lake. The northern tip of the island is approximately 20 miles southeast of Ogden and the southern tip is approximately 17 miles northwest *96 of Salt Lake City. Although the island is near the population centers of Ogden and Salt Lake City, most of the population lives, and nearly all of the recreational development has occurred, in the area from Salt Lake City eastward and not westward toward Antelope Island. To the east of Salt Lake City lies the pine-covered and snow-capped Wasatch Mountains, which have been used for summer homes, hunting and fishing, and ski resorts. In contrast, the land to the west of Salt Lake City and surrounding the lake is arid, and the soil is saline. Only industry is expanding in that direction, and there is a great amount of land available for such expansion. The private recreation centers which have been operated in that area have generally failed. To the southwest of Salt Lake City are three smelter towns. In 1964, the only connection by road to Antelope Island was a 3-mile long causeway, which, along with the private road leading to and from the causeway, was maintained by Island Ranching. At present, in addition to that causeway to the southeastern portion of the island, there is a road, which is maintained by the State, to the northern tip of the island. A mountain spine, which *97 runs almost the full length of the island, rises as much as 2,400 feet above the lake, and approximately 20 percent of the land on the island will not sustain any vegetation because it is sheer rock. The eastern portion of the island slopes more gently than the western portion and contains approximately 450 acres of dry farm wheat land. The vegetation on the rest of the island consists primarily of a sagebrush cover with early grasses, which provide forage for 600 head of cattle during the winter months and suitable pasture for additional cattle during the spring. The average yearly rainfall on the island is 10 to 15 inches. Although the island has some fresh water springs and sufficient water to feed the cattle, there is no sustained flow of potable water on Antelope Island, and in 1964 there were no known sources of potable water on the island other than the springs. In addition to the cattle, animal life on the island, in 1964, included approximately 40 to 45 buffalo, 10 horses, a few deer, pheasants, and chukars. Insects, were also present on the island and constituted a considerable problem. The receding Great Salt Lake has left mud flats around the island, and the dropoff *98 from the island to the lake is greater on the western shore than the eastern shore. In 1964, raw sewage was being dumped in 816 the lake, the water around Antelope Island contained considerable fecal accumulation with virulent micro-organisms, and an unpleasant odor was present. These organisms were found as far as 12 to 14 feet up on the shore from the actual water level. Since 1966, when a sewage treatment plant for Salt Lake City was built, the sewage problem has been largely corrected, and the sewage apparently no longer comes in close to the island. However, at times there is still an unpleasant odor in and about the lake. As a result of a peculiarity connected with evaporation from the Great Salt Lake, the island is unusually susceptible to electrical storms and generally sustains at least one major fire a year. In 1964, there were no sewage facilities on the island, and the electricity was generated by a small plant on the island itself. In addition to a barn, a silo, corrals, and miscellaneous buildings, an adobe house which was built in 1850 is on the island. This house is the oldest structure in Utah which is still being used for the purpose for which it was erected. *99 Also of historic interest are the bench marks on the island left by Old Lake Bonneville, an Ic Age lake, as it receded. In 1957 and 1958, Island Ranching purchased three small tracts of land on Antelope Island. The tracts were 28, 158, and 147 acres in size and cost, on a per-acre basis, $30, $25, and $25. The land was purchased because each tract had lakeshore frontage which made the corporation's property vulnerable to incursions by other people and possible fires. In 1964, the State of Utah showed an interest in purchasing the northern tip of Antelope Island for recreational purposes. Island Ranching opposed the purchase as the tip included some of the best grazing land on the island and as unified ownership of the island would be disturbed. After much litigation and pursuant to new enabling legislation, the State, in 1967, purchased 2,000 acres on the northern tip of the island to use as a park. The purchase price of $210,000 included interest, severance damages, fill, meadow land beyond the meander line, and reliction lands. In addition to the monetary payments, Island Ranching received an easement of access to the causeway which the State was to construct from the northern *100 tip of the island to Syracuse, Utah. The park was opened in 1969, and in 1970 nearly 200,000 people visited the park. In each year from 1960 to 1962, Senator Moss, the junior Senator from Utah, introduced bills to make Antelope Island a national park, and from 1963 to the present, he has introduced bills to make the island a national monument. In 1967, such a bill passed the Senate by a 46-33 vote. It died in the Interior Committee of the House of Representatives. No other such bill has passed either house of Congress. In 1964, Senator Moss's bill was opposed by Senator Bennett, the senior Senator from Utah; Representative Lloyd of Utah; the Governor of Utah; the Salt Lake City Chamber of Commerce; and Representative Aspinall of Colorado, chairman of the Interior Committee of the House of Representatives. At various times in 1967, representatives of Island Ranching indicated that the corporation was willing to sell the island to the Federal Government for $500,000, $1,500,000, and $2,500,000. These offers were not based on the value of the Island as a ranch but were in part an attempt by the directors to take advantage of the apparent interest of the National Park Service in Antelope *101 Island. Also in 1967, the Park Service sought to obtain an option to purchase the island. The purchase price was to be $1,400,000, and the exercise of the option was to be conditioned on the passage of Senator Moss's bill. The representatives of the corporation believed that the chances for passage of the bill were not very good and refused to grant the option. The representatives were not willing to risk losing the employees, who would search for other work if the option were granted, unless there were some assurances as to the passage of the bill. At no time has any agency of the United States made a definite offer to purchase the island. There were no sales of Island Ranching stock within either the 5-year period preceding or following October 7, 1964. On February 15, 1971, Island Ranching redeemed 11,231 of its shares from the Bamberger Foundation for $5 a share. On the estate tax return for the estate of Ethel C. Dooly, the petitioners valued the 9,690 share block of Island Ranching at $4.00 per share, and the 64.333 share block of Dooly Corporation at $6,000.00 per share. The respondent valued the 9,690 share block at $14.00 per share, and the 64.333 share block of Dooly *102 Corporation at $14,370.00 per share. It also valued the 50,010 share block of Island Ranching 817 which the Dooly Corporation held at $20.14 per share. In their petition, the petitioners contend that the value of the 9,690 share block of stock was not more than $4.00 per share; and by amended answer, the respondent has alleged that the value of the 9,690 share block was $20.14 per share, while the value of the 50,010 share block was $22.67 per share. The parties have agreed upon the value of all the assets of the Dooly Corporation except for its stock in Island Ranching. Opinion The only issues to be decided concern the valuation, as of October 7, 1964, of two blocks of Island Ranching stock, a majority and a minority block, neither of which represented voting power sufficient to bring about the liquidation of the corporation. The petitioners contend that the valuation of the Island Ranching stock should be based on such factors as the corporation's earnings, its dividend-paying capacity, and the value of its assets, and that their expert witness took such factors into consideration in valuing the two blocks of Island Ranching stock. The respondent, in essence, contends that *103 the stock valuation should be based solely on the value of the assets of Island Ranching. The respondent further contends that even if we do not accept asset value as the sole criterion for valuing the blocks of stock, we should disregard the testimony of the petitioners' witness because his conclusions were based on an appraisal report which incorrectly valued the assets of Island Ranching and on a price-earnings ratio, a dividend-paying capacity, and an investment return rate which were unjustified. The parties agree that section 20.2031-2 (f) of the Estate Tax Regulations is applicable in ascertaining the value of the stock of Island Ranching. The section provides that: (f) Where selling prices or bid and asked prices are unavailable. If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration: * * * (2) in the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the "other relevant factors" referred *104 to in subparagraphs (1) and (2) of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * Where there is an ongoing business such as we have in this case and where there are no sales near the valuation date of the stock to be valued, courts generally have refused to treat either asset value or earning power as the sole criterion in determining stock value. See Hamm v. Commissioner, 325 F. 2d 934, 941 (C.A. 8, 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964); Portland Manufacturing Co., 56 T.C. 58, 80 (1971); Trianon Hotel Co., 30 T.C. 156, 181 (1958); Mathilde B. Hooper, Administratrix, 41 B.T.A. 114, 129 (1940); *105 Anson Evans et al., Trustees, 29 B.T.A. 710, 715-716 (1934). The respondent argues, however, that ranch land has appreciated in value in recent years, that earnings from ranching have been low, and that, therefore, asset value is the only true measure of the value of the stock of Island Ranching. In support of his position, the respondent cites cases in which the Court simply stated that asset value should be considered along with other factors ( Hamm v. Commissioner, supra; Estate of Lida R. Tompkins, 20 T.C.M. 1763, 30 P.-H. Memo. T.C. par. 61,338 (1961)), cases in which the corporation was in the business of subdividing and selling land ( Hamm v. Commissioner, supra; Estate of Henry E. Huntington, 36 B.T.A. 698 (1937)), and Rev. Rul. 59-60, section 5(b), 1959-1 C.B. 237, 243. The only case cited in which the stock was valued solely on the basis of asset value was Estate of Henry E. Huntington, supra. In that case, although the corporation was actively engaged in the business of subdividing and selling land, it was not actively purchasing land. Since it was, in essence, in the *106 business of selling its assets, the Court found that earnings were not a reliable criterion of the corporation's 818 value. No such finding can be made in this case. Island Ranching has been actively engaged in the ranching business since 1884, and in 1964, it was not engaged in the business of selling its underlying assets. In addition, there is no evidence that the corporation intended to liquidate, and there was no power to liquidate attendant to either the 9,690 share block or the 50,010 share block of Island Ranching stock. Utah Code Ann., tit. 16-10-78, 79 (1962). Under similar circumstances, this Court has refused to uphold the respondent's determination that the value of stock of an operating corporation should be determined solely on the basis of asset value. Estate of Lillian May Schroeder, 13 T.C. 259 (1949); see Mathilde B. Hooper, Administratrix, supra; Anson Evans et al., Trustees, supra.Finally, the respondent's reliance on section 5(b) of Rev. Rul. 59-60 is also misplaced as the section is only concerned with closely held investment or real estate holding companies. Thus, in ascertaining the fair market value *107 of the stock of Island Ranching, both earnings and asset value should be considered. Goodwill need not be considered as both parties concede that Island Ranching does not have any substantial goodwill. The petitioners' expert witness, who is a vice president of Merrill Lynch, Pierce, Fenner & Smith Inc., was the only witness to prepare a valuation of the stock of Island Ranching. He examined the records of the business and an appraisal of the value of the corporation's assets as a ranching operation; had discussions with ranchers; considered the history, nature, and prospects of the corporation, the condition of the economy in 1964, and the prospects for the ranching industry in that year. He also searched for sales of comparable stock. Finding no such sales, he capitalized the earnings of the corporation for the past 5 years, capitalized the dividend-paying capacity of the corporation for those same years, and considered the asset values contained in an appraisal report which valued such assets as a ranching operation. Based on the figures thus attained and on his analysis of the ranching industry, and the general economy in 1964, he concluded that the value of the 9,690 share block *108 was $3.50 per share, and that the value of the 50,010 share block was $5.25 per share. Both blocks of stock were valued with the understanding that neither block represented power sufficient to liquidate the corporation, and the difference between the value of the majority and the minority block is due to the fact that the holder of the majority block could control the operation of the business while the holder of the minority block could not do so. The asset appraisal upon which the stock valuation expert relied was prepared by two highly qualified appraisers who testified in this Court. In making their valuation, they utilized the comparative or market data approach to valuation, the income approach, and the replacement cost approach, with the greatest weight being given to the market data approach. That approach is based on amounts paid for land with a comparable carrying capacity and is the generally accepted method of valuing grazing land. Carrying capacity is the "ability of land, through its vegetative cover, to continuously support livestock, ordinarily expressed as number of acres required to furnish feed for an animal unit for one month (AUM) * * *." Appraisal Terminology *109 and Handbook 26 (4th ed. 1962). They determined the value of the assets of Island Ranching, as a ranching operation, to be $950,000, including approximately $225,000 as the value of Antelope Island. The respondent gave the following reasons for rejecting the testimony of the petitioners' stock valuation witness. The first reason given is that the appraisal report upon which the witness relied was in large part based on an incorrect valuation of Antelope Island. The primary basis of this alleged error is claimed to be the treatment of ranching rather than recreation as the highest and best use of the island. In Olson v. United States, 292 U.S. 246, 257 (1934), the issue involved was the valuation of land, and the Supreme Court stated: Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value - a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * * In the present *110 case, to find that recreation was the highest and best use of Antelope Island in 1964 would be to engage in mere speculation and conjecture. In 1964, there was no reasonable probability that the 819 Federal Government would purchase Antelope Island. Senator Moss's bill had not been favorably acted upon and it was being opposed by Senator Bennett, Representative Loyd of Utah, the Governor of Utah, the Salt Lake City Chamber of Commerce, and Representative Aspinall, chairman of the Interior Committee of the House of Representatives. That the bill still has not passed Congress corroborates that as of 1964 there was no reasonable probability that the Federal Government would purchase Antelope Island. Similarly, in 1964, there was no reasonable probability that the State of Utah would purchase all of Antelope Island. The then Governor of Utah testified that in 1964 the State was planning to purchase the northern tip of the island, but that it had no intention to purchase the rest of the island. The rest of the island has never been purchased by the State, and there are no plans for its purchase. Finally, Island Ranching has never received any offers from private parties to develop the *111 island as a recreational area, and with the insect, water, fire, and pollution problems which existed on the island in 1964 and with the history of past failure of private recreation centers in the area immediately surrounding the Great Salt Lake, we find that there was no reasonable probability that a private party would purchase the island for a recreation area in 1964. With no probable willing buyer for Antelope Island as a recreation area and with the island having been used as a ranch for over the past 80 years, we find that the highest and best use of Antelope Island in 1964 was as a ranch. Such conclusion is in accord with the conclusions of the two appraisers who testified for the petitioners and two of the four appraisers who testified for the respondent. We have examined all the evidence presented by the appraisers who found recreation to be the highest and best use of Antelope Island and evaluated the historic importance of the island, but we found nothing to indicate that the use of the island as a recreation area was reasonably probable in 1964. We further find that because the 1967 offers to sell the island and the 1967 offer for a conditional option on the island were *112 based on the speculation concerning Senator Moss's bill, they are not probative of the island's value as of 1964. The second alleged basis of error in valuing Antelope Island is the use of too low of a carrying capacity for the island. The 6 acres per AUM carrying capacity used by the petitioners' expert witnesses was supported by the testimony of the manager of the corporation, a rancher in the area, and a witness who had been the manager of Federal Government lands in the vicinity of Antelope Island in 1964 and who had rated the carrying capacity of those lands. After examining the books of the corporation and after having been on the island, this witness independently concluded that 6 acres per AUM was the maximum carrying capacity of the island. The 3 acres per AUM figure used by the respondent is based on an alleged oral conversation between one of the respondent's witnesses and the manager of Island Ranching. Since the alleged statement has no other independent support, we find that 6 acres per AUM was the proper carrying capacity of the island. The final alleged basis of error in valuing Antelope Island is the use by the petitioners' expert witnesses of sales of properties *113 which are not comparable to Antelope Island. The respondent, therefore, urges us to accept comparable sales presented by his expert witnesses and to disregard sales presented by the petitioners' witnesses. The respondent's first witness testified that the highest and best use of the island in 1964 was ranching, that carrying capacity was the proper way to value ranch land, and that he did not use carrying capacity in choosing his comparables. The comparables he did use do not seem to have any correlation to Antelope Island in regard to size, price per acre, use, or location. Thus, for example, of the 22 comparables on which we have information, 11 were less than 10 percent of the size of Antelope Island and 6 were less than 25 percent of the size. The prices of the comparables varied from $2.50 per acre to $122.96 per acre. Approximately 50 percent of the "comparables" were purchased for use other than as a ranch, and a large percentage were located in the more desirable areas east of Salt Lake City. Of the pieces of property located west of Salt Lake City, 8 were purchased for grazing. Of these 8 pieces of property, 7 were less than 2 percent of the size of the island, and the eighth *114 piece was sold at a per-acre price which was less than one-tenth of the per-acre value which the witness placed on Antelope Island. Furthermore, in comparing the sale prices to Antelope Island, the witness increased the prices by 50 percent because Antelope Island was an island but could give no basis for choosing that particular percentage increase. Finally, the 820 witness incorrectly treated winter grazing land as being per se more valuable than summer grazing land. The respondent's second expert witness prepared a valuation of the island as of 1967 in connection with the acquisition of the northern tip of the island by the State. He testified that his appraisal had been based on Antelope Island being used for recreation but that this use was not the island's highest and best use in 1964. He further testified that he agreed with the methodology and conclusion of the petitioners' witnesses in respect to the valuation of the island as of 1964. A third appraiser for the respondent did not prepare a written report but relied on the comparables used by respondent's first witnesses. The final appraiser for the respondent valued the island as a recreation area, and the highest and *115 best use of his comparables was not ranching but recreation, housing, or industry. In contrast, the sales chosen by the petitioners' appraisers were of ranch lands which they found to be comparable to Antelope Island, and for which the prices could be and were computed in terms of carrying capacity. Although the comparables used by the respondent are more numerous than the petitioners', we reject them and accept the comparables of the petitioners. The petitioners' comparables are of grazing properties which were similar to Antelope Island and which were sold in areas subject to the same general market pressures as exist with respect to the island. The respondent's comparables include lands which do not have grazing as their highest and best use, grazing lands which are not or have not been shown to be comparable to the island, and lands the sales of which were subject to market pressures not existing with respect to Antelope Island in 1964. We thus accept the conclusion in the petitioners' appraisal report with respect to the value of Antelope Island. Another objection raised by the respondent to the petitioners' appraisal report is that the 7-percent rate which was used in capitalizing *116 future earnings was too high. The respondent bases his objection on the fact that for the 5-year period preceding 1964, Island Ranching had an average yearly return on capital of 1.3 percent, and the testimony of a professor of economics that the average return on a ranching operation in Utah is around 2 percent. The respondent, therefore, suggests that a 2 percent capitalization rate should be used. Yet, the capitalization rate and the average rate of return on capital are not the same. The capitalization rate is the rate of return at which an investor is willing to invest his funds taking into consideration the risk factor involved in the investment being contemplated. Dewing, Financial Policy of Corporations 288 (5th ed. 1953). Thus, in determining the capitalization rate, an investor would take into account the rate of a "riskless" investment and add in an allowance for the risk involved in the particular investment being contemplated. In contrast, the average rate of return on capital as used by the respondent is simply the yearly income of an enterprise divided by the capital invested in the corporation. Because the petitioners' appraisers used a capitalization rate which is *117 within the realm of reason, and because there is no evidence indicating that a lower rate should be used, we uphold the petitioners' use of the 7-percent rate. Cf. Essex Motors, 22 B.T.A. 804, 805 (1931); Anita M. Baldwin, 10 B.T.A. 1198, 1201 (1928); Maine Steel, Inc. v. United States, 174 F. Supp. 702, 716 (D. Me. 1959). The respondent further contends that even if the petitioners' asset appraisal report is correct, we should reject the testimony of the petitioners' stock valuation expert because the price-earnings ration, the rate of investment return, and the dividend-paying capacity which he used were unjustified. The expert witness indicated that all the figures were based on his experience and that the price-earnings ratio was derived from ratios by Standard and Poor's for two industries which he believed to be similar to ranching, an industry not considered by Standard and Poor's. Although there may be some differences between the ranching industry and the industries from which the expert took his figures, they were based on the most similar industries with respect to which information was available, and there is no evidence indicating *118 other figures that would be more reliable. Moreover, in his ultimate conclusion as to the value of the stock, the value determined by the expert was substantially higher than the values based upon the price-earnings ratio, and any slight variation in the ratio would not have affected his conclusion. Consequently, we reject this argument of the respondent. Finally, the respondent contends that the petitioners' stock valuation expert did not properly weigh asset value. We have 821 rejected the respondent's contention that only asset value should be considered, and the respondent has suggested no other weight which should be given to that factor. The petitioners' expert considered the value of Island Ranching assets, together with the figures that he reached by applying the price-earnings ratio and the capitalization and dividend-paying capacity of the corporation. The value ultimately selected by him was somewhat higher than the figures resulting from the earnings and dividend approaches and somewhat lower than that based upon asset value, and much of the reduction from asset value is properly accountable by the appropriate discounts for a minority interest and for liquidation. *119 When all the evidence is considered and weighed, we are of the opinion that the expert's conclusions are reasonable, and we find and hold that as of October 7, 1964, the value of the 9,690 share block of stock was $3.50 per share while that of the 50,010 share block was $5.25 per share. To give effect to this conclusion and to reflect the settlement reached on other issues. Decision will be entered under Rule 50.